Lincoln LOVE, a/k/a Lokmar Yazid
Abdul-Wadood, Appellant,

v.

STATE of Indiana, Appellee.

No. 183 S 9.

Supreme Court of Indiana.

Sept. 27, 1984.

Rehearing Denied Nov. 30, 1984.

Timothy M. Mikula, LaPorte, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

The first trial of appellant resulted in a mistrial when the jury was unable to reach a verdict. The second trial resulted in a verdict of guilty of the offense of Kidnapping, a Class A felony. Appellant was sentenced to thirty (30) years imprisonment. Because the instant crime was committed while appellant was serving a sentence on another charge, the thirty (30) year sentence will not begin until he is discharged on his present sentence.

Appellant is a black male who was, at the time of the commission of the instant crime, an inmate of the Indiana State Prison in Michigan City where he is serving a life sentence stemming from a 1975 conviction for murder in the perpetration of a robbery. On April 27, 1980, appellant was in the isolation section of the New Service Building at the prison. The unit houses thirty-four to thirty-five other prisoners. At approximately 10:00 A.M. on that date, appellant and three other inmates, armed with homemade weapons, rushed the guard station and took three guards hostage. The inmates then released the other prisoners in the isolation unit and in an adjacent cell house. The inmates took seven hos-

tages and maintained control over the isolation unit and the cell house.

After approximately eighteen hours, the prisoners surrendered. The hostages were released. Following an investigation, the appellant and five other black males were charged with kidnapping. The investigation disclosed that four white inmates and nine black inmates were active participants in the altercation and the other inmates were merely present during the incident.

On March 17, 1982, a hearing was held on appellant's Motion to Dismiss alleging selective prosecution as grounds. In his recitation of the facts, appellant, in reviewing the testimony of Sergeant Penfold, indicates his testimony to be that the prisoners who were white were classified as "most helping." Those who were black were classified as "aggressive" and were charged with kidnapping.

An examination of the record discloses this to be somewhat distorted. Sergeant Penfold was first asked to give the names of those who his investigation disclosed to be most aggressive. This he did without any indication of race. He was then asked to give the names of those who were most helpful. This he did again without any indication of race. Sergeant Penfold merely made the statement that those listed as most helpful were, in fact, white. There is no indication in his testimony that the inmates were divided into categories because of their race.

Appellant further indicates that Sergeant Penfold testified that he was a racist. Here again, the testimony must be examined with regard to a specific question asking if he was a racist. Sergeant Penfold said he felt he was, based on "if a time came that I felt if there was ever a life or death situation where I, myself, or other whites were being in a position or were in a position where we were attacked or [a] life or death situation, I would tend to side with the whites more than I would with the blacks." Taken in the context of his entire testimony, under the circumstances of this case, this merely translates that he, being a white prison official, would feel more com-

fortable with white inmates than with black inmates during a prison disturbance. This falls far short of being evidence of Sergeant Penfold being a racist to the extent implied by the appellant, in that he would falsify a report against appellant simply because he was black.

Sergeant Penfold also testified that during the course of his investigation he learned that Gerald Jessup, a caucasian inmate, was handcuffed to hostage Daniel Easton and that during this time Jessup threatened to stab Easton. Appellant observes that, notwithstanding this information, Jessup was not charged with any offense stemming from the incident. He apparently tries to leave the impression that Sergeant Penfold deliberately avoided making a bad report against Jessup because he was caucasian. However, an examination of the record discloses that Sergeant Penfold testified he did not talk to Jessup, but did question Easton, who was Jessup's hostage. Following that interview, he listed Jessup as being helpful. There is no indication whatever, in his testimony, that this listing was due to any racial prejudice.

Jessup did testify that he had participated in the planning and the organization of the prison takeover. However, he also testified that he acted as one of the spokesmen for the group in the negotiations and that he had handcuffed both Officer Easton and Officer Dukes for the purpose of moving them to a part of the prison where negotiations were taking place for the purpose of releasing them. He did state that, at the time he handcuffed them, he was fearful of them because of their size and told them that if they caused him any trouble he would stab them with a knife he was carrying.

■ Contrary to the inferences drawn by the appellant in his recitation of the evidence, we find nothing in an examination of the transcript which would indicate that charges were filed or not filed against inmates based upon their race. All indications are that the report made to the prosecuting attorney, upon which he based the charges, did not even state the race of the

participants. The decision to charge was entirely that of the prosecuting attorney who based his decision upon the degree of participation and the conduct and attitude of the various prisoners during the uprising. We find nothing in the record to support the appellant's contention that the charges were filed based on racial prejudice.

■ Appellant claims the trial court erred in denying his Motion to Dismiss based upon the proposition that the State had engaged in discriminatory prosecution. He claims that, although black and white inmates were engaged in the uprising, only black inmates were prosecuted. He cites as supporting authority *Bordenkircher v. Hayes*, (1978) 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 and *Oyler v. Boles*, (1962) 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446. There is no doubt but that the Fourteenth Amendment to the United States Constitution prohibits any state from taking action which would deny any person within its jurisdiction the equal protection of the laws. Certainly it would be a denial of equal protection for state authorities to establish a policy that only blacks would be prosecuted for particular crimes and that whites would be granted immunity.

The subject of discriminatory prosecution has not been covered to any great degree in Indiana case law. The most complete discussion of this subject we find is in 2 *W. LaFave & J. Israel, Criminal Procedure* § 13.4 (1984). In discussing the problem of proof, the authors observe that the weight of authority is that the defendant has the burden of proving that he was, in fact, the victim of selective prosecution, based upon "an impermissible classification such as race, religion, or sex." *Id.* at 187–88.

In the case at bar, the trial court did, in fact, hold a hearing on appellant's contention of selective prosecution.

In the case of *Oyler, supra*, cited by the appellant, the court stated:

"There is no indication that these records of previous convictions, which may not have been compiled until after the three-time offenders had reached the penitentiary, were available to the prosecutors. Hence the allegations set out no more than a failure to prosecute others because of a lack of knowledge of their prior offenses. This does not deny equal protection due petitioners under the Fourteenth Amendment." *Id.* at 456, 82 S.Ct. at 506, 7 L.Ed.2d at 452.

■ The evidence in the case at bar does no more than show that both blacks and whites participated in the uprising. Only a few were prosecuted. Most of those participating, both black and white, were not prosecuted. The decision to prosecute was that of the prosecuting attorney who, at the time he made his decision, did so on the basis of the report of the conduct of the individual inmates. The evidence specifically shows that he did not have information as to the race of those he chose to prosecute. Under these circumstances we hold the trial judge did not err in denying appellant's Motion to Dismiss.

Appellant claims the trial court erred by granting the State's Motion in Limine preventing him from presenting any evidence at trial in support of the defense of selective enforcement. In a related claim he claims the trial court erred by refusing to give his tendered instruction on the defense of selective prosecution. We will address both of these claims of error together.

The trial court afforded the appellant a full and exhaustive evidentiary hearing in the absence of the jury to determine whether or not the appellant had been denied equal protection of the law by reason of discriminatory prosecution. Regarding this subject, Professors LaFave and Israel state:

"Although some authority is to be found that a discriminatory prosecution claim is a 'defense' which is to be raised during the course of the trial and sent to the jury as part of the case just as with, say, a defense of self-defense, this is not a sound procedure. Because the 'question of discriminatory prosecution relates not to the guilt or innocence of [the accused], but rather addresses itself to a

constitutional defect in the institution of the prosecution,' the claim 'should be treated as an application to the court for a dismissal or quashing of the prosecution' and thus should be decided by the court. Moreover, 'because a claim of discriminatory prosecution generally rests upon evidence completely extraneous to the specific facts of the charged offense,' the better practice is to require the claim to be raised and resolved in a pretrial setting." (Citations omitted.) 2 *W. LaFave & J. Israel, supra,* § 13.4(a) at 187.

We wholeheartedly ascribe to the above. The trial court was correct in its manner of handling this question. Thus, the court was also correct in refusing to instruct the jury concerning the defense of selective prosecution.

We hold that the defense of selective prosecution should be treated as an application to the court and heard by the court out of the presence of the jury.

The trial court is in all things affirmed.

All Justices concur.