**David Leon WOODS, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 885 S 343.

Supreme Court of Indiana.

Nov. 28, 1989.

Susan K. Carpenter, State Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Cheryl L. Greiner, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant was charged in Count I pursuant to I.C. 35–42–1–1(1) with the knowing and intentional killing of Juan Placencia,

and in Count II pursuant to I.C. 35–42–5–1 with the robbery and serious bodily injury of the same victim, a Class A felony. In a separate request for a sentence of death, the prosecution alleged pursuant to I.C. 35–50–2–9(b)(1) the aggravating circumstance that appellant committed an intentional killing while committing robbery.

A trial by jury resulted in verdicts of guilty as charged in Counts I and II. Judgments were then entered on the verdicts. Two days later, the jury reconvened for the penalty phase of the trial. Following the presentation of evidence, the jury retired and then returned a verdict recommending the death penalty.

The cause then came on for sentencing. The trial court expressly found that the State proved beyond a reasonable doubt that appellant intentionally killed the victim while committing robbery. The court further concluded that the mitigating circumstances were outweighed by the single aggravating circumstance and ordered death on Count I and fifty years on Count II.

The evidence adduced at the trial viewed most favorably to the verdict shows that the following events transpired. At approximately 4:00 a.m. on April 7, 1984, appellant David Woods, along with Greg Sloan and Pat Sweet, proceeded to the apartment of the victim, Juan Placencia, to steal a television. This occurred in Garrett, Indiana, a small town. Placencia was a seventy-seven-year-old man who had medical problems with a knee. Woods, nineteen years old at the time, was armed with a knife and told Sloan and Sweet that he was going to scare Placencia with it.

Sweet stayed in the yard. Appellant Woods and Sloan approached the door of the apartment and rang the bell. Placencia answered the door, whereupon appellant Woods immediately jumped in and stabbed him several times with the knife. Placencia fell back into a chair, directed them to his money, and began to make noise, asking for help. Woods took the money from Placencia's wallet and then stabbed him again repeatedly. Placencia died from three wounds which pierced his heart.

Woods and Sloan carried out the television and hid it in a trash bin. Later they picked it up and sold it. They also washed their clothes and threw the knife and other items in a creek.

We are presented with twenty-nine issues in this appeal.

I.

The first appellate claim is that the trial court committed error when overruling appellant's motion to suppress and trial objections to the admission of his confession, the statements of certain witnesses, and certain items of physical evidence, all of which are asserted to be the direct product of his illegal arrest and detention. The Fourth Amendment requires that an arrest or detention for more than a short period be justified by probable cause. Probable cause to arrest exists where the facts and circumstances within the knowledge of the officers or of which they have reasonably trustworthy information are sufficient to warrant a belief by a person of reasonable caution that an offense has been committed and that the person to be arrested has committed it. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Limited investigatory seizures or stops on the street involving a brief question or two and a possible frisk for weapons can be justified by mere reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There is no seizure and thus no requirement of justification when a suspect freely and voluntarily accompanies police officers or shows up at the police station in response to an invitation and is questioned without restraint. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Dillon v. State* (1983), Ind., 454 N.E.2d 845; *Barber v. State* (1981), Ind. App., 418 N.E.2d 563.

At approximately 9:45 a.m. on the same morning, responding to the report of a man needing help, Officer Kleeman of the Garrett police went to Palencia's apartment building and discovered appellant Woods there on a porch crying and incoherent, mumbling something on the order of

"Why did it have to be him." Kleeman had no idea what the problem was. Another person appeared and led Kleeman to the Placencia apartment. Kleeman told appellant to stay on the porch. After Kleeman entered the apartment and saw the body, he reported in and returned to the porch to question Woods about why he had been at the apartment. Woods responded that he had gone to the apartment to use the phone, had discovered the body, and had run from the apartment yelling for help.

Within a few minutes, Kleeman asked appellant to go to a police car away from the onlookers, including relatives of Placencia who had gathered, for further questioning. Appellant was given his *Miranda* rights; he said that he understood them and wanted to waive them. He said that he would talk to police and that he would be more than glad to help them in any way. Appellant was questioned for about a half hour in the car, essentially describing his discovery of the body and adding that he had been with Sloan and Sweet the night before. He was not arrested or physically restrained in any manner.

While appellant was being questioned in the police car, his mother appeared at the scene and told the police that she felt her son had been involved in the killing. She said he had been in and out of their house during the previous night asking for dark clothes and gloves and that he talked nervously about needing money and killing someone. He had talked about killing a woman who lived above Placencia in the same apartment house. She made this statement at about 10:20 a.m. and was transported to the police station where, at 10:40 a.m., she added to her previous statement that appellant had gone to the basement and awakened his brother and that at 7:00 a.m., he had come into the house again and seemed to be troubled about something. She signed a consent to search her house.

In the meantime, at the crime scene at 10:50 a.m., appellant was left alone in the police car after having been cooperative. Within five minutes, appellant, without being arrested or restrained, but without being told that he was free to go, was driven by another officer to the Garrett police station two blocks away. An officer testified that if appellant had sought to leave, he probably would not have grabbed hold of him, but would have asked him to stay until he had conferred with other officers.

Appellant arrived at the police station at about 10:52 a.m. and was escorted by the driver, who was in plain clothes, into the office of the chief. The driver was under instructions to stay with appellant and not engage him in any conversation or permit any one else to engage him in conversation. Appellant was permitted to go into an adjoining toilet and read a newspaper until Officer Kleeman arrived at about 11:50 a.m. He was again given his *Miranda* rights and signed a waiver of rights and a consent to search his residence. He was asked to and did empty his pockets. He had two black pills and a wallet containing $160.00. His wallet and money were returned to him, but the pills were not. Appellant permitted the officer to examine his arms and torso. During this interrogation, appellant asked no questions, was not hesitant, and posed no opposition to anything that was taking place. It was not announced that he was under arrest, and he was not restrained by handcuffs or other devices. He was not told that he was free to go at any time nor was he told that he was not free to go. Appellant basically repeated his former claim of having discovered the body and was left in the office with yet another officer at a few minutes after noon.

At 12:55 p.m., a search of the residence of appellant and his mother produced a knife sheath and a stained towel, among other items. At 1:00 p.m., another person in appellant's residence confirmed that appellant had spoken and acted the night before in the manner attributed to him by his mother in her statement. At 1:20 p.m., one Krotzer gave a statement to police that appellant and Greg Sloan had appeared at his house at 5:00 a.m. and asked to borrow his car to haul a television.

At 4:45 p.m., appellant was still being held in the chief's office and was again

interrogated after having again been read his *Miranda* rights and making an explicit waiver. As new pieces of evidence were worked into the interrogation, appellant's story began to change. A lie detector test was scheduled at the state police post for 8:00 p.m. Appellant was transported in handcuffs to the post where, while answering general questions in preparation for being attached to the machine, he broke down, confessing that he had gone with Sloan to the Placencia apartment to steal a television, had knocked on the door, and had stabbed Placencia as he answered the door and again inside the apartment. Appellant was returned to the county jail where he was formally arrested.

The evidence brought out during the hearing on the motion to suppress, which distinguishes this case from those in which a seizure of the person was held invalid because of the absence of probable cause, was appellant's status as the first person to discover a homicide, appellant's presence at the crime scene shortly after the crime, and the incriminating statements of appellant's mother to the officers at the crime scene and at the police station. In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the police received a tip from an informant and a statement from a jail inmate that Dunaway was implicated in a crime which had occurred four months before. The police simply took him into custody, drove to police headquarters, and gave him his *Miranda* rights, which he waived. He then made an incriminating statement later admitted at trial. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), Brown was arrested in his own apartment for murder a week after the crime because he was on a list of names of acquaintances of the victim. In *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), a rape victim described her assailant as a Negro youth, and appellant, a Negro youth who had occasionally done yard work for the victim, was picked up on the street, taken to headquarters, fingerprinted, interrogated, and released. In none of these cases were there facts and circumstances known to the officers which would have caused a

person of ordinary caution to believe that the suspect had committed the crime under investigation. Here, by contrast, the officers heard from the mother that appellant had planned to rob and kill a woman the night before, discussing different ways of doing so and collecting the means for doing so. It was his habit to be up and about at night and to sleep in the daytime. She then heard him in the basement attempting to wake up his brother. At 7:00 a.m., he returned home again and appeared troubled and told his mother to wake up the children, although it was not a school day. He also said he wanted to go over to Juan Placencia's to use the phone. The mother also supplied information from which the police could infer that Placencia's television had been taken in the attack, and thus that one of the motives in the attack was theft, the motive which appellant had revealed the night before. This information, coming as it did from appellant's mother, who lived in the victim's neighborhood in this small town and knew the victim and appellant well, was the sort of report which in common experience is regarded as having a reliable quality. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). When her report is considered together with appellant's presence and behavior at the crime scene shortly after the killing, the body of information as a whole was such that from it, a person of ordinary caution would be led to believe that appellant had been involved in the criminal activity at that apartment house resulting in the death of Mr. Placencia.

■ Assuming therefore, without explicitly deciding, that appellant was seized when transported from in front of the apartment house to the police station for further intensive interrogation, such seizure was justified by probable cause. Appellant points out that the police did not attempt at the suppression hearing or at trial to justify their conduct by claiming probable cause and that it would not therefore be proper to sustain their conduct on such ground on appeal. The hearing did focus on the facts and circumstances of which the police were aware at the time of

the alleged illegal seizure and therefore provided a rational basis upon which to apply the legal theory of justification by probable cause, despite the reliance of the police on the justification that there had been no seizure. *Smith v. State* (1971), 256 Ind. 603, 271 N.E.2d 133.

## II.

■ Appellant next contends that the trial prosecutor sought to improperly influence the jury's sentence recommendation by urging consideration of inflammatory and irrelevant matter. In the separate hearing at which the jury decides whether or not to recommend the death penalty to the judge, it is improper for the prosecutor to attempt to inflame the passions and prejudices of jurors on a false basis, or to minimize the role of the jury to the point of encouraging a neglect of duty, or to imply that the prosecution or the police have some inside or special knowledge which would support the imposition of the death penalty. *Burris v. State* (1984), Ind., 465 N.E.2d 171, *cert. denied*, 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985). Under the federal Constitution, a sentence of death must be vacated where the trial prosecutor engages in misconduct before a sentencing jury which is so unfair and improper as to undermine the reliability of the sentencing decision. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Indeed, whenever irrelevant and highly inflammatory material is injected at a sentencing hearing, an arbitrariness violative of the Eighth Amendment may result. *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied*, 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987).

Prosecution witness Furnish lived in the house with appellant and appellant's mother and other children. Furnish testified on direct that on the evening before the crime, appellant showed him a lockblade knife with a brown handle and that Furnish then told appellant that "if he did it, he was liable to get the electric chair," and asked appellant "why don't [you] just wait a lit-

tle, you know, for a couple of days for [your] tax return check to come in." Appellant's part of this conversation was not provided, but on cross-examination the witness said there had been no talk about Juan Placencia.

■ In final summation to the jury at both the guilt and sentencing phases, the trial prosecutor urged the jury to draw the inference from Furnish's testimony that appellant intended to rob and kill Placencia as early as that evening. In this argument, the prosecutor outlined the source from the testimony upon which he urged the inference of intent be made. It was therefore an interpretation of the evidence, and as such it was within the confines of ethical and proper conduct. There was no claim of special or personal knowledge. *Swope v. State* (1975), 263 Ind. 148, 325 N.E.2d 193, *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100. There was no improper reference to the possible existence of other crimes or to any future risk to others if the defendant was not put to death. *Tucker v. Francis*, 723 F.2d 1504 (11th Cir.1984), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986). This was no blatant attempt to stir up the passions and prejudice of the jury by referring to irrelevant considerations or sensational materials. *See Drake v. Francis*, 723 F.2d 1504 (11th Cir.1984), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). There was no attempt to minimize the jury's role in deciding whether to recommend the death penalty. Indeed, here the comment was the type which jurors can understand and deal with completely. It did not approach the improper and inflamatory character of the victim impact statement condemned in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied*, 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987).

■ In final summation at the guilt phase of the trial, the trial prosecutor called for the jury to engage in the fight against crime and for justice and to strike a blow against evil and for the sanctity of the home. An argument of this sort, claim-

ing that the jury owes it to the community to recommend the death penalty, amounts to misconduct. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986). The danger of this type of argument is that it can be misunderstood by the jury as calling for the jury to convict the accused regardless of his guilt. *Oricks v. State* (1978), 268 Ind. 680, 377 N.E.2d 1376. Although this argument did pose such a danger, it was not such as to place appellant in a position of grave peril. Given the strength of the prosecution's evidence and the general nature of the patriotic remarks, the degree of impropriety and the probable persuasive effect on the jury's decision was no more than minimal.

The statements made by the trial prosecutor concerning the testimony of the witness Furnish and the duty of the jurors did not constitute cause for mistrial or undermine the reliability of the jury's death sentence recommendation contrary to the requirements of the Eighth Amendment.

### III.

The claim is next made that the death penalty is not appropriately applied in this instance. Appellant asserts that the aggravator alleged and found by the jury and court does not outweigh the overriding mitigating circumstances of his life history.

Review by this Court of every death sentence is automatic and mandatory. The level of scrutiny is more intensive than for other criminal penalties, and the Rules for Appellate Review of Sentences apply as guides and not as limitations. *Cooper v. State* (1989), Ind., 540 N.E.2d 1216; *Spranger v. State* (1986), Ind., 498 N.E.2d 931, *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987).

■ The jury recommended that the death penalty be imposed. The judge declared in his sentencing order that the State proved beyond a reasonable doubt that appellant intentionally killed while robbing. The evidence manifestly proves this aggravating circumstance to a moral certainty beyond a reasonable doubt.

■ The judge also declared in his sentencing order that the State proved beyond a reasonable doubt that the several mitigating circumstances he found to exist were outweighed by the single aggravating circumstance. The mitigating circumstances found by the court were:

a. Appellant had no history of criminal activity as an adult, but this mitigator was lessened in weight by misconduct while a juvenile.

b. Appellant had a mental makeup which included diagnosed borderline personality disorders with aggressive behavior, tempered by a limited capacity to cope so as to do no harm to others.

c. Appellant was nineteen years of age. He lived as a child in an unstable environment. He lacked guidance, was mistreated, and did not have the social and learning skills to perform well in school. He was removed by court order from his home at fourteen and was kept in foster homes and institutions for four and a half years before rejoining his mother's household as an adult. This history was lessened in mitigating value by his failure to live up to household rules while living with others and by his proven ability to restrain his own aggression and hostility by taking walks.

On behalf of appellant, it is extensively argued that where a person's dangerous propensities are the product of his lack of care while growing up and not of his own conscious choices, such person is less deserving of the death penalty. Most would accept this proposition and the proposition that appellant's turbulent childhood is a significant mitigating circumstance. The trial judge did so, and we do likewise. The ultimate question for the judge and jury was, and for this Court now is, whether, upon the statutory assumption that the death penalty can be appropriate for homicide, the mitigating circumstances here, namely, the lack of prior criminal conduct, a turbulent childhood, and borderline personality disorders, are outweighed by the

aggravating circumstance here, namely, the intentional stabbing and killing of Juan Placencia in the course of robbing him. This judgment need not be made to a moral certainty beyond a reasonable doubt. *Moore v. State* (1985), Ind., 479 N.E.2d 1264, *cert. denied,* 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565. Upon review, we find that all mitigating circumstances were properly and accurately determined and evaluated and that they are outweighed by the lone aggravating circumstance, which was also properly and accurately determined and evaluated. The sentence is not arbitrary or capricious and is not manifestly unreasonable.

## IV.

 In instructing the jury at the penalty phase of trial, the court gave the following as Final Instruction No. 5:

Neither sympathy nor prejudice for or against the victim or the defendant in this case should be allowed to influence you in whatever recommendation you may make.

Appellant objected and was overruled, and the instruction was read. Appellant tendered his own instruction which would have authorized the jury to be governed by sympathy and sentiment in arriving at their recommendation on the sentence.

This instruction is to be judged upon the basis of whether it "excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976). It must not impermissibly restrain the jury in its statutory and Eighth Amendment function of determining and evaluating mitigating circumstances and making an individualized assessment of the appropriateness of the death penalty. *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). There are two considerations which render this instruction correct. First, it operates well so as to restrain the use of responses based purely upon emotion, prejudice or bias to the detriment of the defen-

dant. Second, its restraint upon the consideration by the jury of compassionate factors to the benefit of the defendant would be understood by the jury as applying only to the extreme reaches of the human inclination for sympathetic response in light of the specific call of other instructions to the jury to consider mitigating circumstances such as emotional disturbance, minor participatory conduct, and impairment by mental defect, all of which circumstances have compassionate elements. It was not error to give this instruction. It was balanced and did not undermine the reliability of the jury's recommendation. It is also to be noted that this instruction was given to a jury which does not sentence but only recommends and that the trial judge's findings reflect a full appreciation of the impact of appellant's misfortune as a child upon his moral blameworthiness.

## V.

 Appellant claims next that the trial court erred in denying several challenges to the manner and time of filing amended charges of murder and robbery and an amended request for the death sentence. The amended charges and death request upon which appellant was ultimately tried reached their final and quiescent state six months before the commencement of the trial. Both the original and amended requests for the death sentence were based upon the intentional killing during the course of a robbery, pursuant to I.C. 35–50–2–9(b)(1), and were essentially the same. Both the two original and the two amended substantive counts were for the murder and robbery of the victim, Placencia. The original murder charge claimed a felony murder, charging that Placencia had been killed during a robbery, whereas the amended murder charge alleged outright intentional murder. The original robbery charge claimed a repeated stabbing of Placencia, whereas the amended robbery charge alleged a repeated stabbing resulting in serious bodily injury. Under these circumstances, and to the extent that the filing of these amended pleadings was achieved without an initial hearing in con-

junction with it, written notice to the defendant, court permission, or other requirements of the governing statute, I.C. 35–34–1–5, there is no likelihood that substantial rights were prejudiced in light of the similarity of the pleadings and the ample opportunity of the defense to reckon with them. To the extent that there is a purpose behind the governing procedures to protect the due process interests of the defendant, that purpose was satisfied despite any irregularity in the process.

■ Appellant also claims that the amended criminal charges were filed in the DeKalb Superior Court after the court granted a change of venue from the county. The record supports this claim; however, the record also discloses that the filing occurred during the period of time granted by the court for opposing counsel to agree upon a new county and before preparation of the transcript for dispatch. The general rule is that a court is divested of jurisdiction after granting a change of venue. 29 I.L.E. *Venue* § 18 (1960). Here the filing did not entail any exercise of jurisdiction by the DeKalb Superior Court. There is no authority to which our attention is directed declaring a filing of this sort a nullity.

■ Appellant also claims that a written death penalty request must be refiled each time the underlying murder charge is amended. Here, the existing amended death penalty request was not refiled with or after the filing of the amended murder and robbery counts. The death statute requires only that a page kept separate from the balance of the charging instrument allege at least one of the aggravating circumstances. There is no authority for a requirement such as appellant proposes, and we can envisage no legitimate interest of the appellant to be served by such a requirement.

## VI.

It is next claimed on appeal that the court erred in refusing to give eight penalty phase final instructions tendered by the defense. The first is a quotation of Article I, § 18 of the Indiana Constitution. The others cover the subjects of the use by the jurors of their own experiences and their beliefs concerning the death penalty, the requirement that the recommendation must be based upon a conviction that aggravators outweigh mitigators, the prosecution's burden of proof, the restriction of the consideration to the lone aggravator, the definition of mitigating circumstances and addition of a list of facts which, if found to exist, would be proper mitigators, the discretion of the jury in determining and evaluating mitigating circumstances, and the use of sentiment and sympathy for appellant.

■ In considering whether any error results from the refusal of a tendered instruction, we must determine: (1) whether the instruction correctly states the law, (2) whether there is evidence in the record to support the giving of the instruction, and (3) whether the substance of the instruction is covered by other instructions which are given. *Davis v. State* (1976), 265 Ind. 476, 355 N.E.2d 836.

Article I, § 18 provides:

The penal code shall be founded on principles of reformation, and not of vindictive justice.

This Court held in *Adams v. State* (1971), 259 Ind. 64, 271 N.E.2d 425, by a vote of three to two, that the death penalty for murder was not violative of this provision. In *Emory v. State* (1981), Ind., 420 N.E.2d 883, the Court held that this provision did not foreclose a criminal system based on punishment. It does instead "reveal an underlying concern ... that, notwithstanding society's valid concerns with protecting itself and providing retribution for serious crimes, the State criminal justice system must afford an opportunity for rehabilitation where reasonably possible." *Fointno v. State* (1986), Ind., 487 N.E.2d 140, 144. In *Denson v. State* (1975), 263 Ind. 315, 330 N.E.2d 734, this Court held that it was not error to refuse this instruction, despite the fact that it was a correct statement of law, since the provision seems to be addressed to lawmaking bodies and would likely mislead or confuse a jury. That rationale

would apply with greater force in the penalty phase of a capital case than it would in the guilt phase since the jury is being called upon to decide the propriety of a sentence which forecloses all possibility of reforming the defendant. There was no error in refusing the tendered instruction quoting this provision.

 Appellant's tendered instruction on the use of sentiment and sympathy provided as follows:

A decision to grant David Leon Woods mercy does not violate the law. The law does not forbid you from being influenced by pity for David Leon Woods and you may be governed by mere sentiment and sympathy for David Leon Woods in arriving at a proper penalty in this case.

You need not find the existence of any mitigating fact or circumstance in order to return a recommendation against death.

This instruction was an incorrect statement of the law. It is contrary to the statute which requires the recommendation of death to be based upon the relative weight of aggravating circumstances and mitigating circumstances. I.C. 35–50–2–9(e)(2).

The substance of the remaining penalty phase instructions rejected by the trial court was adequately covered by the court's Instruction No. 10, which defined reasonable doubt, and by the court's Instructions Nos. 8 and 11, which tracked the statutes and pleadings and enumerated the statutory categories of mitigating circumstances, including the final general category of "any other circumstances appropriate for consideration." I.C. 35–50–2–9(c)(8).

### VII.

 In its order changing the venue of this case from the DeKalb Superior Court to the Boone Superior Court, the judge included the following in his order:

The Court now has a telephone conference with The Hon. Paul H. Johnston [sic], Jr. of the Boone Superior Court, and . . . he accepts the said request. The Court finds that the Prosecuting Attorney and Defendant have stipulated that the Hon. Paul H. Johnston [sic], Jr. shall

remain as Judge and will agree upon him as Special Judge for any proceedings which might take place after January 1, 1985 in the event that the Hon. Paul H. Johnston [sic], Jr. would not be reelected to the Boone Superior Court.

Judge Johnson assumed jurisdiction on change of venue, but was not reelected. His successor, Judge Peyton, assumed jurisdiction over the case over appellant's objection. An interlocutory appeal was sought but did not result in a ruling on this matter.

The general rule is that the jurisdiction over cases filed in any given court, or coming into any given court from another county on a change of venue, is in that court. I.C. 35–36–6–2; Ind.R.Tr.P. 78. It is also a general rule that when a judicial office is vacated and a new judge assumes the office, such new judge assumes jurisdiction over all matters that were pending in the court before the former judge sitting as the regular judge. *Cf.* Ind.R.Tr.P. 79(15). Here, Judge Johnson had jurisdiction over this pending case as the regular judge of the Boone Superior court. Since he was serving over this case as regular judge when he vacated the office, no occasion arose for the selection and appointment of a special judge pursuant to the stipulation of the parties. Judge Peyton had jurisdiction over this case from the moment he took office and was correct in retaining it despite the order of the DeKalb Superior Court.

### VIII.

 Appellant next contends that the trial court erred in denying his challenge to the jury array on the basis that the jury commissioners excluded persons who had served as a juror within the preceding year. According to statute, persons with such prior service may not serve as petit jurors and are subject to challenge for cause. I.C. 33–4–5–7; I.C. 35–37–1–5. Appellant contends that there is no authority in the specific statutory provision governing the manner of selecting jurors, I.C. 33–4–5–2, to exclude persons with prior service from groups of prospective jurors and that the

systematic and intentional exclusion of this particular class of people results in prospective juror panels which do not reflect a fair cross section of their communities as required by the Sixth Amendment.

Dealing first with the statutory interpretation problem, we find that I.C. 33-4-5-2 instructs jury commissioners upon the proper manner of selecting names of prospective jurors and that I.C. 33-4-5-7 deals with the legal qualifications for jurors. So considered, they are not in conflict but in tandem, one supplementing the other.

The Sixth Amendment guarantee of trial by jury carries with it the requirement that jurors be selected from fair cross sections of their communities and is violated by the systematic exclusion of distinctive groups of community members. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). State retention of the authority to make reasonable standards for juror qualification and exemption leaves jury lists representative of the community. *Oricks v. State* (1978), 268 Ind. 680, 377 N.E.2d 1376.

There are two probable purposes of the statutory disqualification of persons who have served in the recent past. The first is to prevent the same people from returning again and again to court as jurors. It is important to the fair operation of the jury system that there be no development and use of cadres of what can amount to professional jurors. It is conceivable that jurors who return time and again could come under the influence of and adopt the biases of court officers. Upon this consideration, the statutory disqualification is consonant with the fair cross section requirement.

The second probable purpose is to spread the hardship of jury service among members of the community. In *Oricks,* this Court held that the exemption of college students and teachers from jury service to relieve them of a special hardship was proper despite the loss of young and educated persons from the panels. *Id.* In like manner, the disqualification here is sustainable. Appellant's right to trial by jury before a jury selected from a fair cross section of the community was not violated by the disqualification applied here.

## IX.

■ It is next contended that the trial court erred in excusing a juror midway through the trial. In conference with the court and counsel, a juror told of his medical problems including diabetes, a rash from high blood pressure medicine, and a cold. The defense objected to the court excusing the juror. The court then ordered the juror examined by a physician. Thereafter, the trial court announced in court that the juror had been taken to a hospital emergency room, examined by a physician and found to have a fever. Because of this and other medical problems, the physician was of the opinion that the juror was not physically able to continue serving. The court then excused the juror and ordered the first alternate juror to assume service on the jury. The defense objected again and moved for mistrial.

A ruling of the court excusing a juror and elevating an alternate is reviewable for an abuse of discretion. *Ferry v. State* (1983), Ind., 453 N.E.2d 207. Appellant contends that the failure of the court to place evidence in the record to show that the juror was physically unable to continue constituted such an abuse of discretion. Here, the court's efforts in examining the juror in the presence of counsel and announcing the results of his examination satisfied the court's duty to provide a record for review and an opportunity to the defense to be heard. There was no abuse of discretion.

## X.

■ Appellant next contends that his confession should have been suppressed upon his pretrial motion and in-trial objections.

At 7:45 p.m., on Saturday, April 7, 1984, Detective Stump and Chief Custer took appellant from the Garrett Police Department to the state police post in Fort Wayne. Appellant's hands were cuffed in front. There was little conversation. The events of day leading up to this point have been

set out in detail above. Placencia was killed that Saturday morning at about 5:00 a.m. Appellant had been transported to the Garrett police station at about 10:00 a.m. He had waived his *Miranda* rights, had been interrogated at noon and again at 4:45 p.m., had persisted in maintaining his innocence and had agreed to take a polygraph test. Upon arriving at the post, appellant was turned over to the polygraph operator, was given his *Miranda* rights, and signed a written waiver at 9:11 p.m. He was tired at the time and said that he had slept eight hours Thursday night and that had been his last period of sleep. During some questioning in the polygraph room with the operator, preliminary to the test, appellant broke down and gave a full confession. This confession was recorded, but was not introduced into evidence. Appellant was then turned back to Stump and Custer, who took him to an interview room, gave him *Miranda* rights again, which he waived in writing, and took a complete confession from him which was recorded. This recording of the confession was played to the jury.

The law governing the admissibility of confessions was stated in *Ortiz v. State* (1976), 265 Ind. 549, 553, 356 N.E.2d 1188, 1191 (citations omitted):

A statement by an accused is not admissible against him if it is not voluntarily given. A statement made under circumstances requiring the giving of *Miranda* warnings is not admissible unless such warnings are given and a knowing and intelligent waiver of the rights involved is made.

In determining whether a statement was voluntarily given, we look to all the circumstances surrounding its giving to determine whether it was "induced by any violence, threats, promises, or other improper influence." The same test determines whether a waiver of the *Miranda* rights has occurred. The burden is on the State to prove beyond a reasonable doubt the voluntariness of the statement or waiver. In reviewing the trial court's ruling on the voluntariness of a statement or waiver, we do not weigh the evidence, but determine whether there is sufficient evidence to support the trial court's finding.

Appellants correctly assert that the signing of a waiver form does not conclusively show a valid waiver.

The testimony provided by the officers shows that on the occasion of each session of interrogation, appellant was given his *Miranda* rights and signed a written waiver. He had been detained for a total of about nine hours when he gave his confession. He was handcuffed only on the occasion of his transportation to the state police post. The police were often not visibly armed and never drew a weapon in his presence. He was provided with food, water and facilities. During the nine hours, he was permitted to read the paper and play cards. There is no evidence that suggests that appellant was physically abused or subjected to prolonged interrogation sessions. Appellant testified that he was threatened during the 4:45 session. The record shows that in that session, the interrogators accused him repeatedly of lying and made threats that they were just going to charge him with murder and lock him up. However, that matter is reduced in weight due to the fact that the drive to Fort Wayne intervened between it and the confession to the polygraph operator. The officers who drove appellant and the officer conducting the polygraph test were not the same officers as those who had conducted the 4:45 session.

We find that the trial court's overruling of appellant's motion to suppress and in-trial objections was proper and supported by sufficient evidence.

## XI.

Appellant next contends that the trial court erred in denying three of his motions for continuance. On January 16, 1985, this cause was set for trial to commence on February 19, 1985. Counsel was present.

On February 7, 1985, appellant filed a motion for stay of proceedings because an interlocutory appeal was being sought in the Court of Appeals, attacking the jurisdiction of the trial judge. The motion was

788

denied on February 11. On February 15, a motion for continuance was filed due to the fact that the courthouse had been closed from February 10 through February 14 because of a snow storm, which motion was denied on the first morning of trial. On February 23, a motion for continuance was filed because one of the two defense counsel was away from court interviewing witnesses. It was also overruled.

 The granting or denial of a continuance is primarily a matter for the trial court, and the denial of one will be reviewed only for an abuse of discretion. *Taylor v. State* (1987), Ind., 515 N.E.2d 1095. Granting continuances in order to allow additional time for preparation is generally not favored in criminal cases and will be granted only if it is not disruptive and is in furtherance of justice.

 In the pretrial period after the trial date was set and at trial, counsel for appellant was actively filing motions and conducting the affairs of the defense. There is no basis in the record upon which to conclude that additional time for preparation and consultation would have better equipped defense counsel to represent their client. Consequently there is no error shown.

### XII.

 The next question presented is whether the trial court was in error in not holding a hearing upon a pretrial suggestion of defense counsel that appellant was not competent to stand trial. Such a hearing is required if "the court has reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense." I.C. 35-36-3-1. The written suggestion was based upon some unspecified information from two persons and the claim that appellant had no recollection of the events of the night of the alleged killing. In response to the written suggestion, the court appointed two doctors to examine appellant. Each filed a report that appellant was competent to stand trial. Based upon this record, the trial court ordered that reasonable grounds were absent and

that no hearing be held. The evidence clearly justified the court in not holding a hearing, as it supported adequate competency. *Clifford v. State* (1984), Ind., 457 N.E.2d 536.

 Following the trial and before the final sentencing hearing before the court, the court did conduct a hearing upon the question of whether appellant was competent to stand trial and adjudged that he was. The record of this hearing incorporated prior testimony of professional persons who had examined appellant and had testified at the death sentence hearing before the jury, detailing his chronic lack of self-esteem and depression. The record also included observations of appellant's demeanor and the assertion of trial counsel in the written suggestion of incompetency that he was unable to recall the significant events of the alleged murder. Despite the claimed loss of memory, the record clearly provided a reasonable basis for the determination of competency. *Ritchie v. State* (1984), Ind., 468 N.E.2d 1369.

### XIII.

Appellant next questions the denial of his motion for mistrial. Two separate officers who testified for the prosecution referred in their testimony to Exhibit 7 as the murder weapon. On each occasion, the court sustained an objection to the statement and admonished the jury to disregard the reference. On the second occasion, a motion for mistrial was made and denied.

 The granting of a mistrial lies within the discretion of the trial court and a denial will be reversed only where an abuse of discretion can be shown. *Collins v. State* (1984), Ind., 464 N.E.2d 1286. Only if the statement was so prejudicial that it placed the defendant in grave peril must the case be reversed. *Morse v. State* (1980), 274 Ind. 652, 413 N.E.2d 885. When a jury is admonished to disregard a trial event, or if other reasonable curative measures are taken, no reversible error will ordinarily be found. *Ramos v. State* (1982), Ind., 433 N.E.2d 757.

It was improper for the State's witnesses to testify that the exhibit, a knife, was in fact the murder weapon. However, there was testimony placing this knife in possession of appellant Woods at the time the victim was stabbed, and a wire in the apartment had been cut. After the killing, appellant's accomplice saw blood on the knife when appellant placed it in a bag to be thrown in a creek. The inference that this exhibit was the murder weapon was there, and while that inference could have been suggested by the prosecutor in final summation and could have been made by the jury, it should not have been drawn by the officers in their testimony. We believe, however, that the jury received the testimony as an interpretation by the officers of the evidence presented at trial and, therefore, would have therefore been willing and able to comply with the admonition by the court to disregard it and draw an independent inference.

### XIV.

The next issue involves the admission of State's Exhibit 6, two black capsules taken from appellant when interrogated at the Garrett police station. The chemist tested the capsules and found caffeine. Defense counsel objected on the basis that they lacked relevance and created prejudice. The objection was overruled.

The capsules and their test results were relevant as they substantiated the testimony of witnesses who said that appellant behaved in a nervous and troubled manner on the night in question. As stated in *Magley v. State* (1975), 263 Ind. 618, 641, 335 N.E.2d 811, 825, "The fact that a piece of evidence makes an inference slightly more probable suffices to show its relevance." The relevance was appreciable and the prejudicial effect was not great in light of the fact that caffeine is a common lawful substance. The threat to the fairness of the trial from any speculation by the jury about overuse of caffeine by appellant was minimal and did not make the items inadmissible.

### XV.

The next issue involves the ruling of the court refusing to bar the accomplice Sloan from testifying at trial. In preliminary questions outside the presence of the jury, Sloan testified that he had entered a plea of guilty to aiding in a murder and aiding in a robbery and was at the time awaiting sentencing in the DeKalb Superior Court. He denied knowing that his testimony would be considered as mitigating in his case. Defense counsel presented a transcript of a hearing at which the judge in DeKalb County said the State would consider Sloan's testimony as mitigating at sentencing. The State then agreed with the judge's statements. Sloan persisted in disclaiming any knowledge of such an agreement, even though he was handed a copy of the transcript to read. At one point, it was obvious that he did not know the meaning of the word "mitigating."

Defense counsel argued that Sloan's testimony was not voluntary and sought to exclude it. The court allowed Sloan's testimony. During the testimony at trial, Sloan repeated his former disclosure, namely that he had pleaded guilty but insisted again that there was no agreement that he would be treated leniently if he testified.

The general rule is that an accomplice is a competent witness and the fact that the accomplice has been induced to testify by a benefit extended to him by the state goes only to weight and credibility. *Coleman v. State* (1975), 264 Ind. 64, 339 N.E.2d 51. Here, the general rule applies to sustain the court's ruling that the witness should be permitted to testify. The testimony of Sloan before the jury was that there had been no agreement that he would receive a reduced sentence for his testimony, and he repeated that he wished to waive his privilege against self-incrimination and was giving his testimony voluntarily. The defense was well equipped to confront this witness and did so, albeit with limited success. There was no legal basis upon which the court might have barred this witness.

### XVI.

Officer Kleeman testified that he was acquainted with the victim, Juan Placencia,

and had found his body in a chair in the apartment in Garrett. Deputy Coroner Carpenter removed the body from the apartment and it was either in his physical custody or locked in the morgue, to which he alone had a key, until the commencement of the autopsy attended by Deputy Coroner Souder, a physician. Over objection, Souder was permitted to testify that the body was that of Juan Placencia, and the death certificate signed by him showing that one Juan Placencia died of stab wounds was admitted as Exhibit 14.

The objection to the identification testimony and the exhibit was that the chain of custody of the body was defective and the testimony was based on hearsay. There was also a motion for directed verdict at the close of the State's case for failing to prove corpus delicti. The testimony of Officer Kleeman alone established corpus delicti, namely that Juan Placencia had died from a violent attack with a knife. As recited above, the body here was in the custody and control of Carpenter from the chair in which it was found to the operating table upon which the examination commenced. The autopsy commenced four hours after the body was discovered. There was no link in the chain of custody even partially missing and therefore no error. *Coleman v. State* (1975), 264 Ind. 64, 339 N.E.2d 51. Souder testified that he based his identification of the body as that of Juan Placencia upon his comparison of the body with a photograph upon a driver's license bearing the name of Juan Placencia. However, such statement was included in the certified certificate of death, which certificate was properly admitted as a public record. *Wright v. State* (1977), 266 Ind. 327, 363 N.E.2d 1221. Therefore any error in permitting the maker of that certificate to restate what was in evidence in writing could not but be harmless. There was no error in overruling the motion for directed verdict or in overruling the objections to such evidence.

## XVII.

During the course of the trial, the prosecutor introduced in evidence four photographs. Two of the exhibits were color photographs of the body of the victim in the location and condition in which it was found, collapsed back in a stuffed chair. The body is clothed in an undershirt and jeans. The shirt is soaked in blood and many wounds are evident. The other two exhibits are color photographs of the body of the victim stretched out on a slab in the morgue. In one, the shirt has been removed to uncover the multiple wounds to the torso. There are no indications in these last two photographs of any cutting done by the pathologist. Defense counsel objected to the introduction of the four photographs on the basis that their prejudicial effect would outweigh their probative value.

Photographs of the crime scene and of the body in a homicide case are properly admitted so long as they are to some extent competent and relevant aids to the jury in orienting themselves and understanding the evidence. *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482. These photographs were useful in helping to illustrate the location of the victim within the apartment as he was attacked the second time. The morgue photos were useful in showing the location and number of wounds. None were gruesome or introduced an improper element of artificiality and the trial court did not err in admitting them into evidence.

## XVIII.

Appellant next contends that the trial court erred in admitting eleven exhibits: a television, a baseball bat, a knife, socks, a cap, plastic bags, a billfold, a tray, a television cable, money, and a taped statement of appellant. The objection lodged to these exhibits was in each instance the failure of the prosecution, as proponent of them, to establish an adequate chain of custody.

The purpose of requiring a continuous chain of custody from the time an item comes into the possession of the police to the admission at trial is to lay a proper foundation connecting the evidence with the accused and to negate any substantial likelihood of tampering, loss, substitution,

or mistake. *Arnold v. State* (1982), Ind., 436 N.E.2d 288. The more susceptible an item is to being substituted or altered, the more stringent the foundation. *Coleman v. State* (1975), 264 Ind. 64, 339 N.E.2d 51. However, all that is necessary is a reasonable showing that the evidence reached the trier of fact in an undisturbed condition. *Russell v. State* (1986), Ind., 489 N.E.2d 955.

 All of the challenged items were common in character and unremarkable in evidentiary value. There was evidence presented from which one could infer the location of each item and the persons having possession of each item from the time of acquisition by authorities to the time of trial. The television was shown as having been acquired from the persons who purchased it from appellant and Sloan and passing through the hands of various officers, and was identified in court by the children of the victim, who bought it for him. The serial number matched the number on a purchase receipt for a television found in the victim's apartment. The bat was picked up in appellant's yard, passed through the hands of various officers, and was identified by Sloan as looking like the bat he threw there that morning. The knife, socks and stocking cap were in a plastic bag when recovered from a creek by a police diver. He put his initials on the knife. The items passed through the hands of several officers and at trial the diver identified the knife by his initials, and he and Sloan testified that the remaining items looked like the ones they had previously seen.

The wallet, tray, and antenna wire were picked up and held by one Jagoda and transferred to and held by one Zauner, who gave them to Stump who brought them to court for trial. While being held by Zauner, they were removed four times, once by Stump for a day, once by Stump for a month while they were being tested for blood, once for a day while they were being tested for fingerprints, and once by Jagoda who took them to court prior to trial. The cash money passed through the hands of several officers after having been placed in a sealed envelope. The tape recording of appellant's statement was taken by the officer who conducted the interrogation and placed in the state police property room. It was checked out and returned several times before being checked out to be taken to trial. The officer who took the statement testified at trial that he had just listened to it, and that it was a complete and accurate recording of his interview with appellant.

Given the nature of these items of evidence and their evidentiary use, the record before us is adequate to show a continuity of possession and the absence of significant possibility of alteration, substitution, or mistake with respect to them. The chain of custody argument is not sustained.

## XIX.

 The next specification of error relates to the denial of appellant's motion for individual, sequestered voir dire of prospective jurors. Appellant contends that group voir dire causes one juror to be influenced by being present with and hearing the opinions of others and that, in a capital case, the heightened need to have an unbiased and impartial jury warrants the additional safeguard.

As appellant recognizes, this issue has been before the Court before and rejected. *Wisehart v. State* (1985), Ind., 484 N.E.2d 949, *cert. denied*, 476 U.S. 1189, 106 S.Ct. 2929, 91 L.Ed.2d 556 (1986); *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). The rationale of the rule suggested by appellant is insufficiently persuasive to warrant the general adoption of such a procedure. The Court has made it clear, however, that the trial court retains discretion to require such procedures should special circumstances arise. No special circumstances were present here.

## XX.

 Appellant next contends that it was error to give the State's tendered Instruction No. 3 at the guilt phase of the trial over his objection that it was incor-

rect, argumentative, and that the subject of it was covered in the standard reasonable doubt instruction. The instruction stated:

> The doctrine of reasonable doubt applies only to the ultimate question of the defendant's guilt or innocence and the essential facts that establish it[,] and the mere fact that some subsidiary matters are but imperfectly proved does not make it the matter of the jury to acquit if the ultimate question of the defendant's guilt is established to your satisfaction beyond a reasonable doubt.

The Due Process Clause requires that a conviction be based upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The instruction satisfies this constitutional requirement and serves the further legitimate purpose of guiding the jury in the manner of dealing with imperfectly proved subsidiary matters. In *Gramm v. State* (1978), 268 Ind. 492, 376 N.E.2d 1120, this Court held that the decision to give an instruction nearly identical to Instruction No. 3 was not error. Moreover, it is to be noted that the jury was instructed that the defendant must be found not guilty if the State failed to prove every essential element of the charges beyond a reasonable doubt. The instruction was not subject to the defects identified in the objection, and there was no error.

### XXI.

■ After the jury returned its recommendation of the death sentence, and before the court did sentence, appellant requested that he be given a psychiatric examination. Appellant claims that the trial court's denial of this motion was error.

The court is authorized by statute to order a physical and mental examination after conviction and prior to sentencing. I.C. 35–4.1–4–10. However, the decision not to do so is reviewed under the abuse of discretion standard. This Court erected this review standard in *Alleyn v. State* (1981), Ind., 427 N.E.2d 1095, when reviewing a prior statute of like import, and we see no reason to apply a different standard in regard to the present statute.

Here appellant had been examined in the early stages of the pretrial period, and again a few days before trial, to determine his competence to stand trial. The court did conduct a hearing, after trial and before court sentencing, upon the question of whether appellant was competent to stand trial. Based on the results of the prior testing and on the court's observations of appellant, the court determined that appellant was competent and additionally denied his request for further examination. The record of the proceedings from that hearing provide a reasonable basis to support the court's decision not to have appellant examined again.

Appellant argues that he was subjected to the stress of the guilt and penalty phases of the trial, that he was taking medication during trial, that he was taken to a hospital immediately after the jury returned its recommendation, and that he was under close observation in his cell. The trial court was monitoring this situation and was in the position to assess these events as they may have occurred and influenced the mental condition of appellant, and we find no abuse of discretion under these circumstances. We also find that the record of the post-trial hearing on competence was an adequate basis, consistent with due process, for the court to proceed with the sentencing hearing without further medical examinations and thereafter to evaluate the possible mitigating circumstances related to appellant's mental condition. *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

### XXII.

■ After sentencing, the court appointed one of appellant's two trial counsel to prepare the motion to correct errors and denied a request for the other attorney to assist. He now contends that this was error.

The proposition that the defendant in a criminal case is entitled to counsel at public

expense if necessary for the prosecution of a motion to correct errors needs no citation of supporting authority. We have, however, said that in a capital case, where there is no waiver of appeal and no waiver of counsel, the defendant is "entitled to the fullest assistance of counsel at every critical stage of this appeal." *Lowery v. State* (1982), Ind., 434 N.E.2d 868, 871, *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986).

It is the duty of the trial judge to select and appoint counsel to represent a criminal defendant who is without means to employ one. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *German v. State* (1978), 268 Ind. 67, 373 N.E.2d 880. In such circumstances, the defendant does not have the right to counsel of his own choice. *Harris v. State* (1981), Ind., 427 N.E.2d 658. The trial court's duty here was to appoint counsel who could provide reasonably effective assistance with regard to the preparation and proper prosecution of a motion to correct errors. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The trial court concluded that the single defense counsel he selected had the skill and knowledge to prepare and prosecute an adequate motion.

There are no special considerations presented in support of this appellate claim. We are cognizant, however, of the growing belief that two trial counsel are necessary for a complete defense in a capital case. While there are valid reasons for this belief, those reasons do not apply with equal force with respect to the job for which lone counsel was appointed in this case. For the most part, counsel preparing a motion to correct errors gives consideration to the record and any newly discovered evidence. Trial counsel, by contrast, must deal with and prepare pleadings and motions, meet multiple time limitations, conduct investigations, negotiate with counsel for the State, meet with the court, and prepare for and attend the trial. We hold that the trial court's decision was entirely reasonable and resulted in no appreciable harm to appellant's rights.

## XXIII.

 Appellant next claims that the court committed error when it considered improper aggravating factors in the weighing process resulting in the final decision to impose the death sentence, and by failing to personally conclude that the death sentence was appropriate punishment. In the court's findings, three aggravators were found, namely, the one alleged, with the other two being the age and physical infirmity of the victim. The predicate for this claim is nevertheless not present in the record.

The record shows that the trial judge combined the record and processes of sentencing for the robbery conviction and the homicide conviction in one finding and order. The order ended with two separate sentencing paragraphs, one assessing fifty years for robbery and the other assessing death for murder. Each of the classes of mitigating circumstances enumerated in the death sentence statute are given discrete consideration. In describing the final weighing process by which the trial court decided to impose the death sentence, the judge said:

> The court finds the State in requesting the death sentence has proven beyond a reasonable doubt the aggravating circumstance alleged and that the mitigating circumstances which exist are outweighed by the aggravating circumstance.

It is clear from the use of the singular "aggravating circumstance" at two crucial points in this finding that the trial court restricted itself to determining and weighing the lone aggravating circumstance pleaded by the State and enumerated in I.C. 35–50–2–9(b)(1). This appellate claim can therefore not be sustained. It is also clear from the syntax of this recitation that the court made a personal finding and was not functioning in a review mode as to the jury's recommendation.

## XXIV.

 Appellant next claims that the trial court committed error when denying his

motion to dismiss the death penalty allegation predicated on multiple grounds. The claims asserted were that the death penalty and death by electrocution are violative of the Eighth Amendment of the United States Constitution, and Article I, § 18 of the Indiana Constitution. As appellant acknowledges, these broad claims have previously been rejected. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, *reh'g denied*, 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976); *Adams v. State* (1971), 259 Ind. 64, 271 N.E.2d 425.

Appellant's motion also asserted, and the trial court also rejected, claims challenging the Indiana statute on the basis that it provides no standard for finding mitigating circumstances, provides no guidance on how to weigh the mitigating circumstances versus aggravating circumstances, does not require the jury to make findings, and does not provide any meaningful standard upon which to base the death decision. As appellant acknowledges, these claims have been considered by this Court and decided adversely to his position. *Resnover v. State* (1984), Ind., 460 N.E.2d 922, *cert. denied*, 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160; *Williams v. State* (1982), Ind., 430 N.E.2d 759, *cert. denied*, 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47, *reh'g denied*, 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 626.

Appellant also asserts that the aggravating circumstance, intentionally killing while committing an enumerated felony, defined in I.C. 35–50–2–9(b)(1) and applied in this case, is unconstitutional because it does not distinguish in a meaningful way those who should be executed and those who should be permitted to live. The substantially contemporaneous presence of the intent to kill and the intent to commit one of the serious enumerated felonies is the gravamen of this aggravating circumstance, and it serves to place the person convicted of murder as an initial matter in the class of those who are subject to the death sentence. It is not unconstitutional. *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, *reh'g denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982); *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95.

## XXV.

Appellant next contends that it was error for the trial court to order the incorporation of all of the trial evidence from the guilt phase trial into the penalty phase trial over his objection and to instruct the jury that it could consider such evidence in making its sentencing recommendation. Appellant argues that there is much in this body of evidence upon which the jury might seize and use to support its own finding of an uncharged or illegal aggravating circumstance and add the weight of that to the aggravator side of the scale when determining the sentence.

The use of all of the evidence introduced at the trial stage by the jury at the jury sentencing hearing is expressly authorized by statute. I.C. 35–50–2–9(d). The process was sanctioned in *Smith v. State* (1985), Ind., 475 N.E.2d 1139. Furthermore, the jury does not receive this trial evidence to be used in its discretion, but is instructed by the court on the use to which it may properly be put at the penalty stage trial. In the penalty phase instructions, only one aggravating circumstance was stated and defined, namely the one alleged by the State, and the jury was expressly restricted to consideration of that one. Accordingly, the incorporation of all of the trial evidence into the penalty phase trial before the jury did not create the danger of arbitrariness or capriciousness posed in this argument.

## XXVI.

Appellant filed a motion to disallow consideration of robbery as an aggravating circumstance in the penalty hearing for murder. The motion was predicated upon the Fifth Amendment guarantee against double jeopardy, made applicable to the states through the Fourteenth Amendment and Article I, § 14 of the Indiana Constitution. The motion was denied. Such guarantees protect against a second prosecution for the same offense after conviction and against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

Appellant contends that he is being punished twice for the robbery. The premise for this conclusion is that both the fifty-year sentence and the sentence of death are based upon the same robbery, namely that of Juan Placencia. The commission of a robbery is an essential element of the aggravating circumstance of committing an intentional killing in the course of committing a robbery, and thus an indispensable element for the imposition of the death penalty.

Pursuant to the Indiana death sentence statute, an aggravating circumstance serves to identify those convicted of murder who may be subjected to the death penalty. I.C. 35–50–2–9(b)(1). An aggravating circumstance, having served this selection function, also serves upon discrete evaluation as a balancing element, the weight of which must be determined and measured against mitigating circumstances in the final process of deciding whether death is deserved. I.C. 35–50–2–9(e)(2). Appellant is therefore correct in asserting that this sentence of death and this sentence of fifty years both rest upon the commission of the same robbery, the former resting in essential part upon it, and the latter resting wholly upon it. Under such circumstances, both sentences cannot stand consistent with the guarantee against twice being punished for the same offense. The appropriate remedy for this violation should be the same as that which applies when two contemporaneous crimes are deemed merged because the commission of one has played an essential role in determination of guilt of the commission of the other, or the one is a lesser and included offense of the other. In such circumstances, the conviction and sentence for the lesser offense is vacated. *Eddy v. State* (1986), Ind., 496 N.E.2d 24; *Bevill v. State* (1985), Ind., 472 N.E.2d 1247; *Bean v. State* (1978), 267 Ind. 528, 371 N.E.2d 713. We therefore hold that there is a basis in this argument for vacation of the sentence of fifty years for robbery but not the conviction for robbery; however, there is no basis here for setting aside the sentence of death.

### XXVII.

■ Appellant next claims that the trial court committed error in denying his motion to dismiss the death penalty request, which motion was based upon the assertion that the death penalty statute was being applied to him in a discriminatory manner. The factual premise for this argument is that the prosecutor did not request the death penalty when prosecuting charges against appellant's two accomplices arising out of this same incident and when prosecuting two other unrelated homicide cases arising in the same county.

The claim of discriminatory prosecution was recognized by this Court as a legitimate one in *Love v. State* (1984), Ind., 468 N.E.2d 519, *cert. denied,* 471 U.S. 1104, 105 S.Ct. 2335, 85 L.Ed.2d 851 (1985). There the claim was based upon the right to the equal protection of the laws, and the factual predicate was the assertion that state authorities were engaged in prosecuting black inmates who had engaged in a prison riot while granting immunity to white inmates who had done so. There the trial court granted a pretrial hearing and resolved the issue against the defense. Here no hearing was held. Also, in the case at bar, by contrast, there is no claim that the prosecutor engaged in exercising his prosecutorial discretion so as to discriminate on the basis of race, religion, sex, or similar ground. From the record and the face of the motion to dismiss, this Court knows that appellant was the most culpable of the group of three, in that he actually inflicted the fatal wounds. Furthermore, we do not find that the fact that a prosecutor should exercise his discretion in a different manner in other unrelated homicides, though they may have some factual similarities, constitutes the basis for a valid discrimination claim. Consequently there was no error in denying the motion and in doing so without holding a hearing.

### XXVIII.

■ The next assertion is that the trial court violated the death sentence statute, and consequently denied appellant due process, by permitting the prosecutor to intro-

796

duce rebuttal evidence at the penalty phase hearing before the jury. Appellant objected, asserting that the prosecutor should not be permitted to introduce evidence in rebuttal since it might constitute additional aggravating circumstances. The argument on appeal is dissimilar in that it is a complaint about the introduction of rebuttal evidence which tended to disprove mitigating circumstances shown by appellant's witnesses. The State is correct that the error claimed in this argument on appeal was not preserved by a timely and proper objection. *Beland v. State* (1985), Ind., 476 N.E.2d 843; *Thomas v. State* (1976), 264 Ind. 581, 348 N.E.2d 4.

In light of the fact that this is a capital case, the death sentence statute has been read in consideration of this claim, and the Court reads it as permitting the prosecution to introduce rebuttal evidence tending to disprove mitigating circumstances shown by the defendant's evidence. The statute in I.C. 35–50–2–9(d) calls for a hearing to be held having most of the hallmarks of a trial on the question of guilt or innocence. New and additional evidence is to be presented and the standard of beyond a reasonable doubt is to be applied. The determination that death is deserved is intended by the legislature to have the highest level of integrity and reliability which the criminal justice system is capable of producing. The statute specifically states that "[t]he defendant may present any additional evidence" relevant to the aggravating circumstances alleged or any of the mitigating circumstances permitted by the statute. *Id.* There is no express disallowance of rebuttal evidence and, in light of the statute as a whole and its purpose, it is proper to permit such evidence.

### XXIX.

Appellant next asserts that the trial court erred by denying his motion to dismiss the death penalty request because it was not brought by a grand jury indictment. Appellant acknowledges that this claim, based upon the Fifth Amendment, was decided adversely to his position in *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, *cert. denied,* 475 U.S. 1031, 106 S.Ct.

1241, 89 L.Ed.2d 349 (1986). There is no new authority or rationale presented upon which a different decision might rest. We therefore reaffirm the holding in *Bieghler.*

We affirm the convictions for robbery and murder and the imposition of the sentence of death.

SHEPARD, C.J., and GIVAN, PIVARNIK and DICKSON, JJ., concur.