Perry S. MILLER, Appellant,

v.

STATE of Indiana, Appellee.

No. 64S00–9012–DP–817.

Supreme Court of Indiana.

Oct. 26, 1993.

John E. Martin, Law offices of James V. Tsoutsouris, Valparaiso, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of Murder; Criminal Confinement, a Class B felony; Rape, a Class A felony; Criminal Deviate Conduct, a Class A felony; Robbery, a Class A felony; and Conspiracy to Commit Murder, a Class A

felony. Appellant was sentenced to death on the murder charge, twenty (20) years on the confinement charge, fifty (50) years on the rape charge, fifty (50) years on the criminal deviate conduct charge, and fifty (50) years on the conspiracy to commit murder charge.

The facts are: On November 14, 1990 at approximately 1:20 a.m., Valparaiso Police officer Michael Brickner discovered that Christel Helmchen, the attendant at the White Hen Pantry, was missing. At approximately 4:30 p.m. on the same day, Helmchen's body was discovered at 180 U.S. Highway 6.

An autopsy revealed the cause of death to be a shotgun wound to the head. The autopsy also revealed that Helmchen had been the victim of sexual assault and that she had received severe injuries to the pubic area and to her anal canal. Her body also contained a number of bruises and contusions.

Later that evening, Helmchen's checkbook was found in the driveway of appellant's home. The police were seeking information concerning Rodney Wood and William Harmon. Appellant told police that Harmon and Wood had left at approximately midnight on November 14, and he had not seen them since. At that time, appellant was not a suspect.

Appellant consented to a search of his home and two shotguns were found in the attic of a bedroom, identified as the bedroom of Harmon and Wood. Appellant denied having seen the shotguns before. On November 15, 1990, the Owensboro Police Department notified authorities in Valparaiso that they had four individuals in custody and two of them resided at 206 Holcomb, which was appellant's address. Both Indiana State Police and Porter County Sheriff's officers flew to Owensboro, Kentucky to interrogate the suspects.

Upon arrival, they were advised that William Harmon, Rodney Wood, Stephanie Bell and April Bowman had been apprehended near a vehicle which had been stolen from LaPorte, Indiana. The vehicle contained Helmchen's black leather suede coat and a blue spotted shirt missing one sleeve that was used for the purpose of gagging Helmchen. The suspects, together with the evidence, were transported back to Indiana.

Wood entered into a plea agreement with the State wherein it was agreed the State would not pursue the death penalty if Wood made a statement. Wood's statement implicated both Harmon and appellant in the crime. In his statement, he said he had lived with his stepfather, appellant, for the past three months, and during that period, he and Harmon began stealing cars and burglarizing property. Among other items, Harmon and Wood took several shotguns out of the burglarized premises and brought them into appellant's home. He stated that he and Harmon sawed the barrels off the shotguns despite appellant's objection so that they would be easier to conceal.

On November 12, 1990, Wood, Harmon and appellant had a conversation about robbing the White Hen Pantry. On the night of November 14, 1990, another conversation took place between appellant, Harmon and Wood concerning the robbery of the White Hen Pantry. Wood testified that during this discussion, "Miller indicated that he had found a location where the trio could rape and kill the clerk." Wood further testified that when they got to the location they were going to "rape, have fun with, and kill" the White Hen Pantry clerk. He stated there was no mention during this conversation who actually was going to kill the victim.

Shortly after this conversation, they departed for the White Hen Pantry taking with them a .38 caliber pistol, a sawed-off .12 gauge shotgun, a .12 gauge pump shotgun, a spool of nylon rope and a sleeve torn from a flannel shirt for the purpose of gagging the clerk. They first drove to a house under construction in Jackson Township on the south side of U.S. Highway 6.

After surveying the area, Wood, Harmon and appellant proceeded to the White Hen Pantry located on Calumet Avenue. Upon arriving, Harmon and Wood exited the vehicle in back of the White Hen Pantry

while appellant sat in his car across from the store. Wood and Harmon entered the store where they pretended to buy cans of pop. However, when the clerk opened the register, they drew their weapons and proceeded to take money, then they escorted the clerk outside where they entered her vehicle.

With Wood driving and the clerk and Harmon in the backseat they proceeded north on Highway 49 to U.S. Highway 6. During the ride, Harmon gagged and tied the clerk. Upon arriving at the construction site, they dragged the clerk into the partially constructed dwelling. When appellant entered the premises, he began to fondle the clerk. Appellant threw the victim to the floor, removed her clothing and instructed Wood to have sexual intercourse with her, which he did. Appellant then instructed Harmon to have sexual intercourse with the clerk. He instructed Harmon and Wood to tie the clerk in an upright position to the wall of the house where appellant began to beat her with his fists. Harmon then struck her with the .12 gauge shotgun. Appellant then beat the victim with a two-by-four and stuck an ice pick in her right breast and right thigh. Appellant told Wood and Harmon to find something to insert in the victim's rectum. They removed a tire iron from the trunk of the victim's vehicle and inserted it into her rectum several times while appellant watched.

As Wood and appellant left the premises to go to their car, Harmon exited the house with the clerk, put a shotgun to the back of her head and pulled the trigger. Harmon, Wood and appellant then proceeded back to LaPorte where along the way Harmon threw the clerk's clothing from the vehicle. Shortly thereafter, Harmon, Wood, April Bowman and Stephanie Bell left for Owensboro, Kentucky where they were subsequently arrested.

Lisa Black, a forensic hair examiner for the Indiana State Police Laboratory in Lowell, Indiana, identified State's Exhibit No. 54 as hairs collected from the right thigh of the victim. Of the six hairs collected, one hair had characteristics similar to the known pubic hair standard of appellant. The examiner was able to eliminate the possibility that the hair could have come from either Wood or Harmon.

Appellant claims fundamental error was committed when the prosecuting attorney stated his opinion with regard to the truthfulness of the witnesses and the guilt of appellant. Appellant claims that during his closing arguments, the prosecuting attorney made several references to his personal opinion regarding the truthfulness of the witnesses and his personal opinion with regard to the guilt of appellant. We have previously stated that a prosecuting attorney may not state his personal beliefs in closing argument. *Lopez v. State* (1988), Ind., 527 N.E.2d 1119.

■ However, in the case at bar, the statements of the prosecutor do not indicate that he had independent knowledge which was not placed in evidence that would establish the guilt of appellant. In commenting upon the evidence presented concerning the robbery, he stated, "I don't think there's much doubt that there was in fact a robbery and who did it." There was no indication in this statement that he had any information other than what had been presented to the jury and that he was commenting on the sufficiency of that evidence.

■ In commenting on the defendant's interpretation of the evidence, the prosecutor stated, "I don't think that makes any sense." Again, the prosecutor merely was commenting on the evidence presented to the jury and was not attempting to imply that he had information concerning appellant's guilt which was not placed in evidence. Commenting upon the truthfulness of Wood in his implication of appellant and the possibility that he was implicating appellant solely for the purpose of gaining favor with the State, the prosecutor merely stated, "To me, I don't believe it." At another point, the prosecutor referred to "some of the other evidence that I thought was important...." He stated, "[T]he evidence, I believe is, the defendant is in that

same store...." Again, this is merely a statement of what the evidence showed.

█ The mere use of the phrases "I believe" or "I think" does not constitute improper argument. Expression of a personal opinion is not improper where the prosecutor is commenting on the credibility of the evidence as long as there is no implication that he had access to special information outside the evidence presented to the jury and that such outside information convinced the prosecutor of the guilt of the accused. *See Nagy v. State* (1987), Ind., 505 N.E.2d 434. The *Lopez* case does not say that the mere use of the words "I believe" is *ipso facto* improper.

█ Appellant also contends it was error for the prosecutor to refer to appellant as a "mean s.o.b." The prosecutor merely was commenting on the fact that the evidence showed appellant to have been an aggressive, sadistic individual. Again, this characterization of appellant was well supported by the evidence and the nature of the crime.

█ The State also points out that none of the instances cited by appellant was called to the court's attention by proper objection. Any issue regarding the State's closing argument is therefore waived. *Mftari v. State* (1989), Ind., 537 N.E.2d 469. We would further point out that a claim of fundamental error is not viable absent a showing of grave peril and the possible effect on the jury's decision. *Scherer v. State* (1990), Ind., 563 N.E.2d 584.

█ Appellant claims the prosecutor erred when he stated that the prosecutor and the police officers had the duty to present the truth, whereas the defendant had no such responsibility. Appellant points out that the prosecutor quoted from the dissenting and concurring opinion in *United States v. Wade* (1967), 388 U.S. 218, 256, 87 S.Ct. 1926, 1947, 18 L.Ed.2d 1149, 1174, as follows:

"Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent." That's my duty. "They must be dedicat-

ed to make a criminal trial, a procedure of the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all, nor should it be."

We disapprove of a prosecutor reading from the dissent in *Wade*.

When one examines the full text of the prosecutor's comments, it becomes obvious that he was not so much comparing the burden of the State with that of the defendant as he was apologizing to the jury for the State taking so long to try the case by reason of its burden of proof. His comments did not therefore constitute prosecutorial misconduct under *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843.

Appellant cites *Bardonner v. State* (1992), Ind.App., 587 N.E.2d 1353, wherein the Court of Appeals reversed a theft conviction due to the prosecutor's improper *voir dire* commentary. The Court of Appeals distinguished *Hubbard v. State* (1974), 262 Ind. 176, 313 N.E.2d 346, on two grounds. First, in *Hubbard* the comments of the prosecutor had occurred on final argument, whereas in *Bardonner* the comments had occurred on *voir dire*. Second, in *Bardonner* the prosecuting attorney read at length from *Wade* and interspersed his quotes from that case with his own remarks emphasizing repeatedly how the State had the responsibility to tell the truth whereas the defense did not. In the case at bar, as in *Hubbard*, the prosecutor's remarks were not as extended and not as pointed as those in *Bardonner*.

█ Appellant contends Indiana's capital sentencing scheme fails to provide sufficient guidance to the "sentencer" concerning who has the burden of proving whether aggravation outweighs mitigation; therefore, the statute should be declared unconstitutional. Appellant observes that Ind. Code § 35–50–2–9 prohibits consideration of aggravating circumstances which have not been proved beyond a reasonable doubt. However, he claims there is no guidance on two crucial questions: "1) which—the prosecution or the defense has

the burden of proving whether aggravation outweighs mitigation; and 2) what standard of proof does the sentencer use in making this determination"?

We previously have addressed the question of the sufficiency of the guidance to the sentencer in regard to aggravating and mitigating factors. *See Fleenor v. State* (1987), Ind., 514 N.E.2d 80, *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158. We further held in *Fleenor* that the statute was not constitutionally flawed for failing to require the sentencer to find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. We noted that the determination of weight to be accorded between the aggravating and mitigating circumstances was not a "fact" to be proven but is a balancing process. *Id.*

There is no question that under the statute the State is required to prove at least one aggravator beyond a reasonable doubt. However, it also is true that although some mitigating circumstances are an integral part of the State's case, during the sentencing process the defendant also is free to introduce any evidence which might be considered as mitigating. The comparison of those factors does not involve the process of proof beyond a reasonable doubt. We see no reversible error here.

■ Appellant contends the Indiana capital sentencing statute is unconstitutional because it limits the sentencer's discretion to exercise mercy. Appellant claims the jury is not adequately informed of its discretion to return a sentence of imprisonment rather than a death penalty even if an aggravating circumstance exists and no mitigating circumstances exist. He claims that in instructing the jury the judge should advise them that they have the discretion to exercise mercy and return a verdict in favor of imprisonment despite the existence of sufficient aggravators to justify the death penalty.

In the case at bar, the court gave appellant's Instruction No. 2 which stated that the jury could recommend mercy for the defendant whether mitigating circumstances existed or not and with or without

reason even though this Court has stated previously such an instruction is not required. *See Woods v. State* (1989), Ind., 547 N.E.2d 772, *cert. denied,* — U.S. —, 111 S.Ct. 2911, 115 L.Ed.2d 1074. Thus, even though such an instruction is not required, it in fact was given in this case. We further would note that Ind.Code § 35–50–2–9(e) states, *inter alia:*

> "The jury *may* recommend the death penalty only if it finds:
>
> 1) that the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances exists; and
>
> 2) that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." (Emphasis supplied.)

It thus is clear that the statute does not mandate the jury to recommend the death penalty, but only gives them that option, which of course leaves room for the exercise of mercy. We find no constitutional impairment in the statute in this regard.

■ Appellant claims the statute is constitutionally infirm because it does not adequately guide the sentencer's determination as to the existence of a mitigating circumstance. Appellant claims the statute should inform the jury that the mitigators are not required to be established "beyond a reasonable doubt." He contends in the absence of a specific admonition in this regard the jury would naturally feel that they must apply the reasonable doubt standard to the mitigators.

A similar instruction was rejected by this Court in *Lowery v. State* (1989), Ind., 547 N.E.2d 1046, *cert. denied,* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176. In the case at bar, appellant tendered no such instruction; thus, the issue was waived. *Whittle v. State* (1989), Ind., 542 N.E.2d 981. All instructions to a jury on reasonable doubt place that burden upon the State. There is no inference in any portion of a trial that a defendant's evidence comes under that scrutiny. Instruction No. 4, actually given in this case without mentioning a standard

of proof, stated that all evidence of mitigating circumstances must be considered. We hardly can see how the jury could have been misled in this situation nor do we find any inadequacy in the statute so far as weight of the evidence of mitigating circumstances is concerned.

Appellant contends the Indiana capital sentencing statute is unconstitutional, as applied, to the extent it requires the sentencers to consider statutory mitigating circumstances whether they are relied upon by the defendant or are relevant to the case. He further claims it accords too little weight to non-statutory mitigating factors. It is difficult to conceive how a sentencer would feel they were required to consider irrelevant or unrelated mitigating circumstances. Even if a sentencer would run through the entire statutory list of mitigators and attempt to apply them to the case, it is difficult to see how this would harm a defendant. We cannot accept appellant's premise in this regard. We see no unconstitutional infirmity in this statute.

Appellant claims Indiana's capital sentencing statute is constitutionally infirm because it fails to adequately guide the sentencer's discretion because it accords "absolutely unguided discretion in imposing a death sentence." He contends that because the jury is instructed that they are the judges of the law as well as the facts this impermissibly nullifies the statutory and constitutional standards for guiding the jury's discretion. The jury in this case, as is usually done, was instructed that although they are the judges of the law they must apply the law as they find it, and they are not to disregard the law. We previously have held that such instruction is proper and that our capital sentencing statute sufficiently guides the jury's discretion. *Fleenor, supra.*

Appellant contends the capital sentencing statute is constitutionally infirm because it permits the judge to override a jury's recommendation, which violates a defendant's right to a trial by jury. This issue, of course, is not present in the case at bar because no such override occurred.

However, we further would point out that the United States Supreme Court has held that such an override is not unconstitutional. *See Spaziano v. Florida* (1984), 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340.

Appellant cites *Adamson v. Ricketts* (9th Cir.1988), 865 F.2d 1011, *cert. denied,* — U.S. —, 112 S.Ct. 3015, 120 L.Ed.2d 888, which held that Arizona's capital punishment statute required the existence of aggravating circumstances to be determined by a judge rather than a jury, violated the defendant's right to trial by jury. However, the Supreme Court of the United States held to the contrary on the same issue. *See Walton v. Arizona* (1990), 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511. We hold the Indiana Capital sentencing statute does not violate the Constitution in that it permits the judge to override a jury's recommendation.

Appellant claims the sentencing statute is unconstitutional because it minimizes the jury's sense of responsibility for its sentencing decision. Appellant cites *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, to support his position. However, in the *Caldwell* case, the prosecuting attorney attempted to minimize the jury's responsibility for imposing the death sentence by advising them that their sentence would not be final but would be reviewed by an appellate court. A divided Supreme Court distinguished *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431, and held that the prosecutor's remarks in *Donnelly* were quite different from the remarks challenged in *Caldwell.* The majority in *Donnelly* held that the prosecutor's comments were ambiguous, whereas in *Caldwell* the majority found the prosecutor's remarks were very focused, unambiguous, and sought to give the jury a view of its role in the capital sentencing procedure that was incompatible with the Constitution.

In the case at bar, we are not dealing with comments made by the prosecuting attorney but are dealing with the structure of a statute which delegates to the jury the role of examining the evidence and making

a recommendation to the trial judge concerning the sentence. In *Caldwell*, the actual responsibility for the death penalty, although reviewable on appeal, was a final determination at the trial level by the jury. In Indiana, all concerned are fully advised that the jury's examination of the evidence and recommendation is for the edification of the trial judge who has the ultimate responsibility in imposing the sentence. *See Huffman v. State* (1989), Ind., 543 N.E.2d 360, *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 767, *overruled on other grounds, Street v. State* (1991), 567 N.E.2d 102.

▮ Appellant claims the sentencing statute is unconstitutional because the State is permitted to open and close final argument, as per Ind.Code § 35–37–2–2. It is well-established procedure in this and most other jurisdictions that the party having the burden of proof opens and closes argument. We would observe that no objection was made at the trial level to this procedure; thus, the issue is· waived. *Woods, supra*. However, we observe that the sentencing in a death penalty case is no different than any other phase of that case or in fact of any other litigation as to the procedure to be followed concerning those having the burden of proof. The statute is not unconstitutional in this regard.

▮ Appellant contends the statute should be held unconstitutional because the death penalty is a cruel and unusual method of punishment and as such violates the Eighth and Fourteenth Amendments to the United States Constitution and art. 1, §§ 16 and 18 of the Indiana Constitution. In making this argument, appellant quotes a rather lengthy and graphic description of an electrocution from Justice Brennan's dissenting opinion to denial of *certiorari* in *Glass v. Louisiana* (1985), 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514. Similar gruesome accounts have been written concerning executions by hanging, firing squad, and lethal injection. It seems obvious that any method used to kill a healthy human being would by its very nature be gruesome and inflict physical damage to the human body. This is a question of

public policy rather than a constitutional question and thus is an argument to be made to the legislative body rather than to a judicial tribunal.

When the Constitution of the United States was drafted prohibiting cruel and unusual punishment, capital punishment was in place and continues to this day. The cases are legion in holding that capital punishment in and of itself does not violate the prohibition against cruel and inhuman punishment. This Court has rejected that claim, stating that we are: "unable to reach the conclusion that this method of execution involves the unnecessary and wanton infliction of pain." *Johnson v. State* (1992), Ind., 584 N.E.2d 1092, 1107, *cert. denied*, —— U.S. ——, 113 S.Ct. 155, 121 L.Ed.2d 105.

▮ Appellant claims the statute impermissibly creates a presumption in favor of the imposition of capital punishment. Appellant takes the position that because the statute lists more aggravating factors than mitigating factors the statute therefore favors the death penalty. As pointed out by the State, the aggravators to be used in any given case are peculiar to that case. The State also correctly observes that there is no limitation on mitigators that may be submitted to the Court.

Appellant cites *Penry v. Lynaugh* (1989), 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, wherein the Supreme Court reversed a death penalty holding because under Texas law there was a failure to adequately consider mitigating facts. In that case, the state proceeding effectively prevented the jury from considering mental retardation as a mitigating circumstance. The Indiana statute does not contain a prohibition against any type of mitigating circumstance.

▮ Appellant also claims our statute fails to adequately limit the sentencer's discretion in imposing the death penalty and prevents the appropriate weighing of mitigating circumstances in violation of *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. However, we find no such infirmity in the Indiana

statute. The Indiana statute is very explicit as to what crimes may be used to impose the death penalty, and under Ind.Code § 35–50–2–9(c)(8), the defendant is permitted to present evidence of any circumstance appropriate for consideration. There is no limitation under the statute in this regard. We find nothing in the statute that presumes to favor the imposition of capital punishment.

■■■ Appellant contends the statute is unconstitutional because it vests in the prosecuting attorney unbridled discretion to file or not file a request for the death penalty. Appellant cites *Furman, supra* for the proposition that death sentences may not be inflicted in an "arbitrary, capricious or freakish" manner. However, we see no such impairment in the Indiana statute. It should be obvious that the decision to prosecute for any type of criminal activity must reside somewhere.

Indiana has chosen by statute to place the responsibility of criminal prosecution on the elected prosecuting attorney of a given county. Ind.Code § 35–34–1–1. Of course, it is the prosecuting attorney's decision to prosecute whether it be for the death penalty or some lesser penalty. His decision does not determine the final outcome. His decision merely places the person on trial. A determination of guilty and the imposition of a penalty lies with the jury and the judge. We repeatedly have held that this type of procedure is not constitutionally impaired. *See Coleman v. State* (1990), Ind., 558 N.E.2d 1059, *cert. denied,* — U.S. —, 111 S.Ct. 2912, 115 L.Ed.2d 1075; *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349.

■■■ Appellant claims he was denied a fair trial because the *voir dire* of the jury was conducted in group form and several jurors made statements revealing information pertaining to appellant's prior convictions in the presence of the rest of the jury panel. In the case at bar, appellant filed a motion for change of venue based upon pretrial publicity within the county. The trial court denied the change from the county; however, it ordered that the jury be drawn from residents of a county other than Porter County. The procedure used was that the panel of prospective jurors were brought into the courtroom and questioned as a group. After questioning, the group was asked to step into the jury room and the court and the attorneys then discussed challenges for cause.

When instances occurred where a particular prospective juror would voice an opinion or state what purported to be facts concerning the case, the remaining panel members were then brought in and questioned individually concerning their reaction to remarks by other prospective jurors. In some instances, jurors so questioned were themselves excused. This procedure continued until members of that particular panel had either been seated or excused. Another panel then would be brought in and the same procedure followed until a full jury was acquired.

■■■ As acknowledged by appellant, a defendant has no absolute right to individual *voir dire. Lowery, supra.* We would further observe that appellant did not object to the manner in which the jury was chosen; thus, the issue was waived. *See Burris v. State* (1984), Ind., 465 N.E.2d 171, *cert. denied,* 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809. Under the system used by the trial court, appellant had every opportunity to challenge jurors and in fact did so. The State also correctly notes that none of the persons who eventually became jurors were challenged for cause by the defense. At the close of *voir dire* and the seating of the jury, the defense still had peremptory challenges which had not been used. We previously have held that in such a situation the appellant cannot complain of the accepted jury. *Monserrate v. State* (1976), 265 Ind. 153, 352 N.E.2d 721.

■■■ Appellant contends the evidence is insufficient to support the existence of a conspiracy to commit murder. Appellant concedes there is evidence which would support a jury's finding of his intent to commit murder and further concedes there was evidence of overt acts toward the murder which were committed. However, he

urges that there was no evidence of an agreement. The evidence as above recited shows that appellant and his accomplices, Harmon and Wood, discussed the robbery and the fact that they would kidnap, "have fun with," rape and murder the night clerk at the White Hen Pantry. However, appellant claims there was no showing of an agreement to kill the night clerk.

■ Appellant appears to take the position that because there was no detailed conversation concerning the killing of the night clerk, there is no evidence to support the conspiracy to kill. We have held previously that proof of a conspiracy may rest entirely on circumstantial evidence. *Smith v. State* (1984), Ind., 465 N.E.2d 1105. The agreement element as well as the *mens rea* can be inferred from circumstances alone, including overt acts of the parties in pursuance of the criminal act. *Mullins v. State* (1988), Ind., 523 N.E.2d 419; *see also, Harbison v. State* (1983), Ind., 452 N.E.2d 943. We hold there is ample evidence to support the jury's verdict of conspiracy to commit murder.

■ Appellant claims it was error for the trial court to permit alternate jurors to enter the jury room during deliberation without express consent from appellant. Appellant cites *United States v. Olano* (9th Cir.1991), 934 F.2d 1425. However, in that case, this procedure was controlled by the Federal Rules of Criminal Procedure which do not control Indiana procedure. In *Johnson v. State* (1977), 267 Ind. 256, 369 N.E.2d 623, *cert. denied,* 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791, this Court held it was permissible for the trial court to have the alternate jurors sit in on and listen to jury deliberations as long as they were properly instructed not to participate in those deliberations. In so holding, we cited *Turczi v. State* (1973), 261 Ind. 273, 301 N.E.2d 752. *See also, Reichard v. State* (1987), Ind., 510 N.E.2d 163. We also note there was no objection to the presence of the alternate jurors during deliberation.

■ Appellant claims it was error to allow evidence of prior criminal conduct. Appellant called Dr. Frank Brogno, a clinical psychologist, as a witness. Dr. Brogno testified that he gave extensive tests to appellant and that he interviewed him and came to the conclusion that appellant "does his best to comply and work with people so that he will be seen as an okay guy." He further stated "there was no indication of a profound psychological disturbance." Defense counsel then asked him whether there was any indication of any sadistic tendencies. Dr. Brogno replied, "No, not in his psychological profile."

In rebuttal to this testimony, the State presented the testimony of Etta Thomas that appellant had raped her and that she was "all bruised up." Another witness, Bev Hunter, testified that defendant got her in her car, pointed a gun at her, made her drive to a secluded location, tied her up, jerked her to the ground and tried to force her to perform fellatio on him, and hit her and knocked her to the ground after she bit him. He then tied her spread-eagled to a tree, split her skirt open with a knife, pulled her back down to the ground, raped her, and threatened to kill her if she told anyone. This type of evidence of course would not have been admissible under *Lawrence v. State* (1984), Ind., 464 N.E.2d 923, in the State's case-in-chief.

However, in view of the fact that appellant saw fit to present evidence that he had no tendency to be sadistic and that there was no indication of profound psychological disturbance the State had the right to present evidence which would rebut that testimony. In permitting the testimony presented by the State, the trial court cited *Bond v. State* (1980), 273 Ind. 233, 403 N.E.2d 812, and *Robertson v. State* (1974), 262 Ind. 562, 319 N.E.2d 833. The trial judge was correct in his ruling and the cases cited by him hold that when a defendant opens the door to his psychological profile the State may rebut the evidence he presents. The trial court did not err in this regard.

The trial court is affirmed.

SHEPARD, C.J., and KRAHULIK, J., concur.

**414**

DeBRULER, J., concurs with separate opinion in which KRAHULIK, J., concurs.

DICKSON, J., concurs and dissents with separate opinion.

DeBRULER, Justice, concurring.

It is essential that this Court determine the reasonableness and propriety of every sentence of death. In requiring this step, Ind.Code § 35–50–2–9(h) provides:

A death sentence is subject to automatic review by the supreme court.... The death sentence may not be executed until the supreme court has completed its review.

Such review serves interests of society beyond the interests of the individual subject to the sentence, and cannot be waived. *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95; *Thompson v. State* (1986), Ind., 492 N.E.2d 264; *Cooper v. State* (1989), Ind., 540 N.E.2d 1216.

The State alleged four statutory aggravating factors: the defendant committed the murder by intentionally killing the victim while committing criminal deviate conduct; while committing rape; while committing robbery; and the defendant was on parole at the time the murder was committed. At the penalty phase, the State relied upon the trial evidence, while the defense presented favorable evidence from a clinical social worker, a former female roommate of the defendant, and the defendant's father and mother. Following the hearing, the jury recommended the death penalty.

The sentencing court then found that: the State had proved beyond a reasonable doubt that the defendant committed this murder by intentionally killing the victim while committing criminal deviate conduct, that the defendant committed this murder by intentionally killing the victim while committing rape, that the defendant committed the murder by intentionally killing the victim while committing robbery, and that the defendant was on parole at the time this murder was committed.

In addition, the court found that no mitigating circumstances existed. The court found further that the aggravating circumstances, proven beyond a reasonable doubt, outweighed any mitigating circumstances. Consequently, the court sentenced the defendant to death.

The evidence of deviate conduct, robbery, rape, and parole status is clearly persuasive. The evidence likewise substantiates the presence of the intent to kill. In planning the crime, appellant said the victim would be killed, and he heard his accomplice Harmon say that he could kill if he had to. Appellant knew Harmon was armed with a shotgun during the robbery, and later on encouraged Harmon to beat the victim with it. Toward the end of the episode, after serious bodily injury had been inflicted upon the victim by appellant and the others, appellant told Wood to move the car and shine the car's headlights up into the windows. Wood did so. Harmon walked into the house, and appellant walked to his car. Appellant told Wood to turn off the lights. Harmon came walking out of the house with the victim, and with appellant and Wood standing by the two cars, Harmon shot and killed her. This is substantial and persuasive evidence that appellant knew that the victim was to be killed, and facilitated the actual killing by Harmon. The weight of aggravators is in the high range.

The evidence in mitigation supports the propositions that appellant had behaved well as a prisoner for nineteen years, had been kind and helpful in his relationship with a roommate and her small child since released on parole, and during childhood had not displayed sadistic tendencies. This evidence is entitled to mitigation value in the low range.

I therefore find that the mitigating circumstances are outweighed by the aggravating circumstances and that the sentence of death as envisioned in the statute is appropriate. Accordingly, I join the Court in affirming the convictions and sentences, including the sentence of death.

KRAHULIK, J., concurs.

DICKSON, Justice, concurring and dissenting.

While concurring with the majority's decision to affirm these convictions, I would not affirm the present death sentence because of the State's misleading final argument and the presence of alternate jurors during the penalty phase deliberations.

With today's decision the Court wisely disapproves of and discourages the reading to the jury of certain excerpts from a minority opinion in United States v. Wade (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, by prosecutors attempting to portray that the prosecutor and police officers have the duty to present the truth, but that defense counsel does not.[1] The Wade excerpt is not decisional law, but only the dissenting opinion of three of nine justices. Reading it to a jury conveys judicial and institutional favoritism for the State and its witnesses, enhancing their credibility, undermines the presumption of innocence, and alters the State's burden of proof. Furthermore, it impinges upon a defendant's right to effective assistance of counsel and can significantly jeopardize the right to a fair trial and an impartial jury. See generally Bardonner v. State (1992), Ind.App., 587 N.E.2d 1353. Clearly, this misleading trial tactic will henceforth be curtailed.

I dissent to the majority's approval of the practice of permitting alternate jurors to sit with and listen to jury deliberations in death penalty cases. While our decisions have permitted this procedure in noncapital cases, it should be forbidden in death penalty cases.

I share the concerns expressed by Justice Pivarnik in Johnson v. State (1977), 267 Ind. 256, 369 N.E.2d 623 (Pivarnik, J., dissenting), cert. denied (1978), 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791. He noted that it is "the alternate juror's lack of a right to deliberate, and his lack of right to vote on a verdict, which defines him as a stranger to the privacy of final deliberation." Id. at 263, 369 N.E.2d at 627. The mere presence of this "stranger" as "a third person during deliberations, without more, may inhibit the free flow of discussion in the jury room." Id. at 262–63, 369 N.E.2d at 627. I cannot dismiss the risk that an alternate juror's non-verbal communication are likely to influence one or more jurors. In addition, the alternate's presence alone may distort the psychological motivations of individual jurors, both as to their ultimate decisions and as to their openness and active participation in the deliberation process, thus interfering with their sworn duty.

1. The following passage is from the separate opinion of Justice White, joined by Justice Harlan and Justice Stewart, dissenting in part and concurring in part:

Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all; nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present the evidence. Defense counsel need present nothing, even if he knows what the truth is. He need not furnish any witnesses to the police, or reveal any confidences of his client, or

furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth. Undoubtedly there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying. In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for truth.

Wade, 388 U.S. at 256–68, 87 S.Ct. at 1947–48, 18 L.Ed.2d at 1174–75 (White, J., dissenting) (footnotes omitted).

We entrust to a capital jury the immense responsibility of recommending whether the death penalty should be imposed, and we accord substantial deference to any resulting recommendation against death. *Kennedy v. State* (1991), Ind., 578 N.E.2d 633, 637, *cert. denied* (1992), — U.S. —, 112 S.Ct. 1299, 117 L.Ed.2d 521; *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, 734. While our precedents clearly permit the presence of the alternate juror during guilt phase deliberations, I would not extend this practice to penalty phase deliberations. We should not compromise the integrity of a jury's death penalty recommendation by subjecting otherwise confidential jury deliberations to the scrutiny and potential influence of a person who does not bear a full share of the moral responsibility for the resulting decision.

Because the misinformation given to the jury through the reading of excerpts from the *Wade* dissent and the presence of an alternate juror during the penalty phase deliberations jeopardize the integrity of a death recommendation, I cannot not share the majority's confidence that the death penalty was properly ordered. I would affirm the convictions, reverse the death sentence, and remand for a new death penalty hearing.