FILED

Aug 31 2020, 10:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Sean P. Hilgendorf
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robin Dale Kilgore Peppers, *Appellant-Defendant,* | August 31, 2020 |
| | Court of Appeals Case No. 20A-CR-796 |
| v. | Appeal from the St. Joseph Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Jeffrey L. Sanford, Judge |
| | Trial Court Cause No. 71D03-1807-F6-714 |

**Kirsch, Judge.**

[1] Robin Dale Kilgore Peppers ("Peppers") appeals his conviction for intimidation[1] as a Class A misdemeanor.[2] He raises two issues, which we restate as:

> I. Whether the State presented sufficient evidence to sustain his conviction; and

> II. Whether the trial court committed fundamental error in the way it conducted voir dire.

[2] We affirm.

## Facts and Procedural History

[3] On June 6, 2018, St. Joseph County Police Corporals Eric Dietrich ("Officer Dietrich") and Neil Hoover ("Officer Hoover") executed an arrest warrant on Peppers at his residence. *Tr. Vol. 2* at 68-69, 77-78. The officers knocked on the front door of the residence, but Peppers did not respond. Peppers "crawl[ed] across the floor army style" toward the front door to lock it and then crawled out of sight. *Id.* at 70, 79-80. Officer Hoover located an unlocked window, opened it, and yelled into the house to announce the officers' presence and to inform Peppers that they were there to arrest him. *Id.* at 80. After receiving no response from Peppers, Officer Hoover entered the residence through the

---

[1] *See* Ind. Code § 35-45-2-1.

[2] The jury found Peppers guilty of intimidation as a Level 6 felony, but the trial court entered a judgment of conviction on the jury's guilty verdict as a Class A misdemeanor. *Appellant's App. Vol. 2* at 26, 30-31; *Tr. Vol. 2* at 141-42, 151.

window, checked the nearby rooms, and opened the front door to allow Officer Dietrich to enter. *Id*. at 70-71, 80-81. Officer Hoover had drawn his firearm for officer safety, but Officer Dietrich had not. *Id.* at 71, 80-81. Eventually, Peppers appeared around the corner from the basement door and was ordered to show his hands. *Id.* at 71, 81-82. When Peppers complied, Officer Hoover holstered his weapon and secured Peppers in handcuffs. *Id.* at 71-73, 81-82. Peppers's step-daughter, who was in the basement, was then allowed to come upstairs. *Id.* at 71, 82-83. Once Peppers was arrested, he was cooperative with Officers Dietrich and Hoover, and the officers had no issues with him. *Id.* at 73, 83, 85-86.

[4] Approximately one month after Peppers was arrested, he created a video titled "To The Judges," which was posted on a YouTube channel called "Death's Clown." *Id.* at 53-54, 61; *State's Ex*. 1. In the video, Peppers threatened to kill "Big Country," which is the nickname of Officer Dietrich, for pointing a gun in Peppers's face and at his step-daughter.[3] *Id.* at 52-53, 59, 64-65, 67, 69, 78, 104-05; *State's Ex*. 1. The video post came to the attention of Assistant Chief Daniel Gebo of the Mishawaka Police Department, and an investigation began. *Tr. Vol. 2* at 51, 53-54. Lieutenant Eric Beckham of the Mishawaka Police Department ("Lieutenant Beckham") interviewed Peppers about the video, and Peppers stated that he was "venting" and seemed "very frustrated" but that he

---

[3] As previously noted, Officer Hoover had his firearm drawn during the execution of the arrest warrant on Peppers while Officer Dietrich did not. *Tr. Vol. 2* at 71, 80-81.

did not want to hurt anyone. *Id.* at 107-08, 111; *State's Ex*. 2. Police obtained a search warrant for Peppers's cell phone. *Tr. Vol. 2* at 54. Lieutenant Brandon Ruth of the Mishawaka Police Department ("Lieutenant Ruth") performed the search of Peppers's phone, which was also named "Death's Clown." *Id.* at 55-56, 59-61. Lieutenant Ruth had viewed the video on YouTube before he extracted it from Peppers's phone and observed that the video extracted from Peppers's phone was the same as the one posted on YouTube. *Id.* at 63-64; *State's Ex*. 1. Peppers admitted to Lieutenant Beckham that people he did not even know had responded to his post of the video on social media. *Tr. Vol. 2* at 107. Officer Dietrich also viewed the video after St. Joseph County Police Detective Mario Cavurro ("Detective Cavurro") saw the video and told Officer Dietrich about it. *Id.* at 66-67, 73.

[5] On July 26, 2018, the State charged Peppers with one count of intimidation as a Level 6 felony. *Appellant's App. Vol. 2* at 220-21. The State amended the charging information twice before trial. *Id.* at 100-02, 203-04. The parties also submitted written questions for voir dire, and Peppers filed a motion to examine the jury panel. *Id.* at 103-11. Peppers submitted eighty-six questions for the prospective jurors, and the State submitted eight questions. *Id.* at 104-09, 110-11. On January 16, 2020, the trial court held a jury trial. *Id.* at 14, 30-31.

[6] Pursuant to Indiana Trial Rule 47(D), which governs the examination of jurors, the trial court questioned the panel of prospective jurors, using some of the parties' questions and some of its own. *Tr. Vol. 2* at 10-38. At the conclusion of the trial court's examination and the parties' brief opening statements to the

jury, but before the parties selected who would serve on the jury, the following

exchange occurred:

> MS. BEACHKOFSKY:  I do want to make a quick record of
> something else just for the record.  Okay?
>
> THE COURT:  You want to make a quick record?  Okay.  About
> what?
>
> MS. BEACHKOFSKY:  That I filed a motion to voir dire the
> jury and there were several questions not asked.
>
> THE COURT:  I think I answered that the last time.  Didn't you
> bring that up the last time?
>
> MS. BEACHKOFSKY:  I did, but I'm preserving it for the
> record here.
>
> THE COURT:  Okay.  And my reading of Trial Rule 47 is this, is
> that you are -- have the right to question the jury, but it doesn't
> necessarily have to be oral.  That's the way the Supreme Court
> has interpreted the rule.  And you were given an opportunity to
> address the jury, and you were given an opportunity to submit
> questions.  That's the record I would make.
>
> MS. BEACHKOFSKY:  I would say for the record that I did
> submit several questions --
>
> THE COURT:  Well, actually you submitted [86] questions, and
> I think a lot of the questions were conditioning in nature and not
> appropriate to ask the jury.
>
> MS. BEACHKOFSKY:  All [86]?

THE COURT:  Uh-huh.  And what questions that weren't asked were already covered by my questions.

MS. BEACHKOFSKY:  I would note that the majority of the answers, if there were any that were given by the jury, were just head nods.  Most of these people didn't speak or didn't say anything during the course of voir dire.

THE COURT:  If they wished to speak, they can raise their hand.  I've had juries where nobody has raised their hand.  I've had other juries where we've had quite a bit of response.  You made your record, ma'am.  Anything else that you want to say on that issue?

MS. BEACHKOFSKY:  Nothing. No, sir.

*Id.* at 31-33.  Following this exchange, Peppers's counsel exercised three peremptory challenges.  *Id.* at 33-36.  She made no objection to the jury panel before it was sworn.  *Id.* at 38.  The jury ultimately found Peppers guilty of intimidation as a Level 6 felony.  *Appellant's App. Vol. 2 at 30-31; Tr. Vol. 2 at* 141-42.  On February 25, 2020, the trial court entered judgment of conviction as a Class A misdemeanor and sentenced Peppers to time served, 247 days. *Appellant's App. Vol. 2* at 26; *Tr. Vol. 2* at 151.  Peppers now appeals.

## Discussion and Decision

## I.  Sufficiency of the Evidence

[7]  Peppers argues that the evidence was insufficient to sustain his intimidation conviction.  When we review the sufficiency of the evidence to support a

conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Lehman v. State,* 55 N.E.3d 863, 868 (Ind. Ct. App. 2016), *trans. denied.* We consider only the evidence most favorable to the trial court's ruling and the reasonable inferences that can be drawn from that evidence. *Lock v. State*, 971 N.E.2d 71, 74 (Ind. 2012). We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* A conviction will be affirmed if there is substantial evidence of probative value that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Wolf v. State*, 76 N.E.3d 911, 915 (Ind. Ct. App. 2017).

[8] Peppers was convicted of Class A misdemeanor intimidation. *Appellant's App. Vol. 2* at 26. At the time Peppers committed the offense, Indiana's intimidation statute provided, in pertinent part, that "[a] person who communicates a threat to another person, with the intent . . . that the other person be placed in fear of retaliation for a prior lawful act . . . commits intimidation, a Class A misdemeanor." Ind. Code § 35-45-2-1(a)(2). The statute also provided that the offense was enhanced to a Level 6 felony if, "the person to whom the threat is communicated . . . is a law enforcement officer . . . ." Ind. Code § 35-45-2-1(b)(1)(B)(i).[4] The statute defined "communicates" as follows:

---

[4] The terms "threat" and "law enforcement officer" are also defined terms. S*ee* Ind. Code § 35-31.5-2-185(a) (defining "law enforcement officer"), Ind. Code § 35-45-2-1(d) (defining "threat" for purposes of Indiana Code section 35-45-2-1). Peppers does not argue that the State failed to prove that the content of the YouTube video was a threat or that Officer Dietrich was not a law enforcement officer.

"'Communicates' includes posting a message electronically, including on a social networking web site (as defined in IC 35-31.5-2-307)." Ind. Code § 35-45-2-1(c).[5] Thus, the State was required to prove beyond a reasonable doubt that Peppers communicated a threat to Officer Dietrich with the intent that Officer Dietrich be placed in fear of retaliation for a prior lawful act. *Appellant's App. Vol. 2.* at 102.

[9]     Peppers limits his argument to whether the State failed to satisfy the communication element of the intimidation statute. He argues that Officer Dietrich's viewing of the YouTube video five weeks after it was posted did not satisfy the communication element of the intimidation statute. The State maintains the evidence was sufficient to sustain Peppers's conviction and that he knew or had good reason to believe that the YouTube video would reach Officer Dietrich.

[10]    It is well-established that a defendant need not speak directly with a victim to communicate a threat for purposes of Indiana Code section 35-45-2-1. *E.B. v. State*, 89 N.E.3d 1087, 1091 (Ind. Ct. App. 2017). Indeed, to communicate a threat for purposes of the offense of intimidation, the statement must be transmitted in such a way that the defendant knows or has good reason to believe the statement will reach the victim. *Ajabu v. State*, 677 N.E.2d 1035, 1043 (Ind. Ct. App. 1997), *trans. denied. See also B.B. v. State*, 141 N.E.3d 856,

---

[5] Indiana Code section 35-45-2-1 was subsequently amended by SECTION 17 of P.L. 66-2019.

861, n.4 (Ind. Ct. App. 2020) (noting that "communication of a threat may be made directly to the victim, or indirectly, such as through a news reporter," (citing *Ajabu*, 677 N.E.2d at 1043)).

[11] Peppers directs us to *Ajabu*, *E.B.*, and *J.T. v. State*, 718 N.E.2d 1119 (Ind. Ct. App. 1999) in support of his position that he did not communicate a threat to Officer Dietrich by posting the YouTube video. In *Ajabu*, the defendant had made threats through the print, radio, and television media. *Id.* at 1037-38. The defendant sought reversal of his convictions for intimidation and argued that the person alleged to be threatened must be present for the threat to be communicated under the statute. *Id.* at 1042. We explained that communication was not limited to only those threats made directly to or in the presence of the threatened party. *Id.* We held that communication can be indirect and affirmed the conviction because the defendant had used means of communication that he "knew or had good reason to believe would reach" the victims. *Id.* at 1043.

[12] In *J.T.*, J.T. and a friend printed a document in their school library. 718 N.E.2d at 1121. The document contained a reference to sacrificing a fellow student in an occult ritual. *Id.* The librarian saw the document and reported it to her supervisors, who later alerted the student who was named in the document. *Id.* at 1121-22. A juvenile court determined J.T. was a delinquent child because, among other grounds, she committed an act that would have constituted intimidation if committed by an adult. *Id.* at 1122. This court reversed that portion of the adjudication, reasoning that there was no evidence that J.T. knew

or had reason to believe that the document would reach the student named therein. *Id.* at 1123-24. Instead, J.T. merely printed the document with the expectation that the document would be returned directly to her. *Id.*

[13] In *E.B.*, E.B. was displeased with recent discipline he received at school, sent a text message to another student warning the second student to wear red the following Tuesday because E.B. "intended to shoot anybody who wasn't wearing red." 89 N.E.3d at 1089 (internal quotations omitted). E.B. also communicated to a third student a similar warning and told the third student to "tell the ones that he cares about." *Id.* (citations omitted). E.B.'s sister overheard E.B. speaking on the phone regarding E.B.'s plan to shoot the assistant principal based on E.B.'s displeasure with his recent discipline. *Id.* Students shared this information with the school administrators, and law enforcement was notified. *Id.* The State alleged that E.B. was a delinquent child for committing two separate intimidation offenses: Count I related to E.B.'s specific threat against the assistant principal, pursuant to Indiana Code section 35-45-2-1(a)(2); and Count II related to E.B.'s communication for "interfering with the occupancy of the school" by sending a text message to a student that he would shoot anyone not wearing red, pursuant to Indiana Code section 35-45-2-1(a)(3). *Id.* at 1090-91. We reversed the portion of the adjudication under Indiana Code section 35-45-2-1(a)(2) on the basis that no evidence existed of the communicated threat to the assistant principal, and the State failed to prove that E.B. placed the assistant principal "in fear of retaliation for a prior lawful act." *Id.* at 1091.

[14]     Here, the evidence was sufficient that Peppers communicated a threat to Officer Dietrich. Unlike the defendants in *J.T.* and *E.B.*, where we reversed portions of their adjudications due to the lack of evidence that the statements were communicated in ways that would reach their intended victims, Peppers posted a video on YouTube. *Tr. Vol. 2* at 54, 59, 67, 73, 104-05.[6] The video was created on Peppers's phone, which he named "Death's Clown," and the video was posted on a YouTube channel of the same name. *Id.* at 63. While there is no specific evidence as to whether the YouTube video was listed as private or public, the testimony at trial revealed that Lieutenant Ruth viewed the video on YouTube before it was extracted pursuant to a search warrant from Peppers's phone and that Officer Dietrich viewed the video after he was alerted to its presence by Detective Cavurro. *Id.* at 54, 63, 67, 73. In fact, Peppers admitted to Lieutenant Beckham during his interview regarding the video that he received feedback from "people he didn't even know responding to the video on social media." *Id.* at 107. Peppers's use of YouTube to post his video is more similar to *Ajabu* where the defendant's statement to the media was sufficient evidence of communication of a threat to the victim, even though the victim was not present when the defendant made the statement. Moreover, electronic communications are specifically covered under the intimidation statute. *See* Ind. Code § 35-45-2-1(c); *McGuire v. State*, 132 N.E.3d 438, 444, n.4 (Ind. Ct.

---

[6] YouTube is an online video sharing platform that has over two billion users who daily view approximately one billion hours of video. http://youtube.com/yt/press/statistics.html (last visited August 23, 2020). The platform is viewed in over 100 countries and can be accessed in 80 languages. *Id.*

App. 2019) (observing that the intimidation statute "specifically contemplates threatening messages posted electronically"), *trans. denied. See also Commonwealth v. Beasley*, 138 A.3d 39, 46-47 (Pa. Super. Ct. 2016) (affirming Beasley's conviction for making a terroristic threat by including a link on his Facebook page to a violent rap video he posted on YouTube in which he threatened to kill certain police officers and noting that Beasley "successfully and intentionally communicated his threat"), *appeal denied*; *Holcomb v. Commonwealth*, 58 Va. App. 339, 709 S.E.2d 711, 714-16 (2011) (affirming Holcomb's conviction for knowingly communicating a written threat in violation of section 18.2-60(A)(1), Va. Code, by posting the threat on his MySpace profile). In light of the evidence presented at trial, the jury could reasonably infer that Peppers publicly posted the video and, as required under our precedent, that he knew or would have had good reason to believe that the video would reach Officer Dietrich. Therefore, the State presented sufficient evidence from which a reasonable jury could determine that the communication element of the intimidation statute was satisfied.

## II.   Voir Dire

[15]   Peppers next contends that the trial court erred by failing to allow Peppers's trial counsel to conduct the examination of prospective jurors. The State argues that Peppers has waived this issue by failing to submit additional questions for the jury after his motion to orally examine the prospective jurors was denied or to object to the jury panel before it was sworn, and that Peppers must show fundamental error. *Appellee's Br.* at 13-14; *Tr. Vol. 2* at 31-33, 38. We agree with

the State that Peppers has waived this issue for review. *See Miller v. State*, 623 N.E.2d 403, 412 (Ind. 1993) (noting that failure to object to the manner in which the jury was chosen resulted in waiver); *Bardonner v. State*, 587 N.E.2d 1353, 1358 (Ind. Ct. App. 1992) (stating that the proper method to raise a challenge during voir dire is "a motion to strike or discharge the jury panel or [to] challenge the array" (citing *Utterback v. State* 261 Ind. 685, 310 N.E.2d 552 (1974))). Fundamental error is an extremely narrow exception to the waiver doctrine that applies only when the error constitutes a blatant denial of basic due process principles that makes it impossible to receive a fair trial. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). A matter rising to the level of fundamental error is a matter that the trial court had a sua sponte duty to correct. *Id.*

[16] Peppers argues that the trial court violated Indiana Trial Rule 47(D) by denying his counsel the right to question the prospective jurors and to ask follow-up questions of the prospective jurors, which he asserts denied him the right to a fair trial. The State maintains that the trial court did not violate Indiana Trial Rule 47(D) and that no error, fundamental or otherwise, occurred.

[17] Indiana Trial Rule 47(D) provides, in pertinent part, as follows:

> The court shall permit the parties or their attorneys to conduct the examination of prospective jurors, and may conduct examination itself. The court's examination may include questions, if any, submitted in writing by any party or attorney. If the court conducts the examination, it shall permit the parties or their attorneys to supplement the examination by further

inquiry. . . . The court may prohibit the parties and their attorneys from examination which is repetitive, argumentative, or otherwise improper but shall permit reasonable inquiry of the panel and individual prospective jurors.

[18] Trial courts have broad discretionary power in regulating the form and substance of voir dire. *Logan v. State*, 729 N.E.2d 125, 133 (Ind. 2000). The decision of the trial court will be reversed only if there is a showing of a manifest abuse of discretion and a denial of a fair trial. *Id.* This will usually require a showing by the defendant that he was in some way prejudiced by the voir dire. *Id*. In *Gibson v. State*, 43 N.E3d 231, 238 (Ind. 2015), the Indiana Supreme Court discussed voir dire and explained that its purpose is:

> [T]o ascertain whether prospective jurors can render an impartial verdict based upon the law and the evidence, *Von Almen v. State*, 496 N.E.2d 55, 59 (Ind. 1986), and "weed out" those who show they cannot be fair to either side. *Burris v. State*, 465 N.E.2d 171, 179 (Ind. 1984). Thus, the parties may "inquire into jurors' biases or tendencies to believe or disbelieve certain things about the nature of the crime itself or about a particular line of defense." *Hopkins v. State*, 429 N.E.2d 631, 634-35 (Ind. 1981) (finding no error where jurors were asked whether they would disbelieve a witness that entered into a plea bargain). . . .

> But, questions should be limited to "testing the capacity and competency of prospective jurors." *Skaggs v. State*, 438 N.E.2d 301, 304 (Ind. Ct. App. 1982). Those that "seek to shape the favorable jury by deliberate exposure to the substantive issues in the case" are not permitted. *Davis v. State*, 598 N.E.2d 1041, 1047 (Ind. 1992) (affirming trial court's disallowing defense counsel from essentially asking prospective jurors "how they would vote in the present case").

[19]     Here, as permitted under Indiana Trial Rule 47(D), the trial court conducted its own examination of the prospective jurors, which was supplemented by questions that had been submitted by the parties. *Tr. Vol. 2* at 10-31; *Appellant's App. Vol. 2* at 104-11. Indiana Trial Rule 47(D) does not mandate a specific form of supplemental inquiry by the parties. *See White v. State*, 263 Ind. 302, 306, 330 N.E.2d 84, 86-87 (1975) (noting that the portion of what was then Indiana Trial Rule 47(A) "cannot be read to require a particular form; such as, verbal questioning" and stating that the trial court properly exercised its "broad discretionary power to restrict interrogation to proper matters by regulating the form as well as the substance of the interrogation."); *Tewell v. State*, 264 Ind. 88, 93-94, 339 N.E.2d 792, 796 (1976) (same). The trial court did not ask all of Peppers's eighty-six questions nor did it ask all of the State's eight questions, but it permitted the parties to address the jury with a brief opening statement concerning the nature of the case, which Peppers used to tell the jury that the case was about free speech and the right to voice political speech. *Tr. Vol. 2* at 10-31; *Appellant's App. Vol. 2* at 104-11.

[20]     We are mindful that Indiana Trial Rule 47(D) states that the trial court "shall permit the parties or their attorneys to conduct the examination" and that if the trial court conducts the examination it "shall permit the parties or their attorneys to supplement the examination court's examination." Indeed, in *Logan*, the Indiana Supreme Court explained that although it was error under Indiana Trial Rule 47(D) for the trial court to "not permit Logan or his attorney to directly question prospective jurors concerning their views on life without

parole," the error was harmless because Logan could not show prejudice. 729 N.E.2d at 133-34. The Court noted that each juror was questioned regarding his or her ability to base a sentencing recommendation on the law and the evidence. *Id.* at 133. The trial court's questioning of the jurors sought to reveal any bias and determine whether the jurors could render a fair and impartial recommendation, which is the purpose of voir dire. *Id.* (citation omitted). It further explained that Logan did not indicate what questions he would have asked and did not explain why the trial court's procedure of asking questions tendered by the parties was inadequate for purposes of empaneling a fair and impartial jury. *Id.* The Court added that Logan failed to show that the trial court's procedure adversely impacted his ability to employ his peremptory challenges or his challenges for cause and did not allege that any specific juror should have been removed and was not. *Id.*

[21] Here, Peppers focuses on the quantity of his questions that went unasked, *see Appellant's Br.* at 13-15, 17-18, but he does not suggest what his verbal supplement could have produced that could not have been achieved through the written questions both parties submitted nor does he specify which of his questions the trial court should have asked the prospective jurors. *See Logan*, 729 N.E.2d at 133; *Bradberry v. State*, 266 Ind. 530, 535, 364 N.E.2d 1183, 1186 (1977) (finding no error in the trial court's conduct of voir dire where counsel were not permitted to orally voir dire the jury and the defendant failed to state how he was harmed by the trial court's rejection or modification of his questions). Peppers attempts to show that the trial court's alleged error was

prejudicial because two prospective jurors had family who were police officers. *Appellant's Br.* at 17. Peppers overlooks the fact that the trial court asked both prospective jurors whether they could be fair and impartial, and although both indicated that they could, neither of those individuals were chosen to sit on the jury. *Id.* at 18, 38. Peppers was able to exercise his peremptory challenges, and there is no indication that the jurors selected or the alternate were not able to apply the law and the facts fairly and impartially in this case. *Id.* at 33-36. *See Logan*, 729 N.E.2d at 133 ("[T]he Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." (citations omitted)). Peppers has failed to show how the trial court's voir procedure led to a jury panel that was not fair or impartial, and we find no error, fundamental or otherwise, in the trial court's conduct of voir dire.

[22] Affirmed.

Pyle, J., and Tavitas, J., concur.